Argued and submitted November 6, 2007, decision of Court of Appeals and
judgment of circuit court affirmed February 7, 2008

## JACOB BARRETT,
*Petitioner on Review,*

*v.*

## Brian BELLEQUE,
Superintendent,
Oregon State Penitentiary,
*Respondent on Review.*

### (CC 05C11516; CA A127929; SC S054622)

176 P3d 1272

Charles M. Simmons, Rader, Stoddard & Perez, P.C., Ontario, argued the cause and filed the briefs for petitioner on review.

Kathleen Cegla, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent on review. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before De Muniz, Chief Justice, and Gillette, Durham, Balmer, Kistler, and Walters, Justices.**

BALMER, J.

---

** Linder, J., did not participate in the consideration or decision of this case.

### BALMER, J.

While serving a prison term in Oregon, petitioner filed a petition for a writ of habeas corpus claiming that he was entitled to a hearing before prison officials removed him from the general prison population and placed him in the prison's intensive management unit (IMU). The trial court dismissed the petition for failure to state a claim. The Court of Appeals affirmed on different grounds, holding that, because petitioner could have challenged the state's placement of him in IMU without a hearing under 42 USC section 1983, that alternative remedy foreclosed habeas relief. *Barrett v. Belleque*, 209 Or App 295, 150 P3d 1064 (2006). Petitioner filed a petition for review in this court, which we allowed. Before oral argument, the state notified the court that Oregon prison officials had sent petitioner to Oklahoma under the Interstate Corrections Compact, ORS 421.245, to serve his Oregon sentence there and moved to dismiss the proceeding as moot. We denied the motion. In briefing and oral argument before this court, the state renewed its motion to dismiss. We now affirm our earlier ruling that this matter is not moot. On the merits, we affirm the decision of the Court of Appeals, but we do so on different grounds.

### I.  FACTS

We take the facts from the pleadings. Officials suspected petitioner of involvement in gang violence in the prison. In February 2003, while he was at Two Rivers Correctional Institution (TRCI), prison officials accused petitioner of instigating a fight between two other prisoners, Cavan and Lewis. Following a hearing, officials put petitioner in administrative segregation for 180 days. Petitioner unsuccessfully appealed that disciplinary sanction. Petitioner was transferred to Snake River Correctional Institution (SRCI) and placed in IMU in March 2003. In March 2003, petitioner filed an administrative appeal of his IMU placement, which was upheld. *See* OAR 291-055-0019(4) (providing for administrative review of a prisoner's "maximum custody classification/ assignment to IMU").

Prison officials created IMU as both a program and a physical area to which they can assign prisoners who pose

security risks because of possible escape, chronic misconduct, or activity involving other prisoners (such as membership in prison gangs). *See* OAR 291-055-0005 to 291-055-0050 (establishing IMU and procedures for IMU placement); OAR 291-104-0005 to 291-104-0135 (establishing general procedures for determining inmate custody levels). IMU facilities exist at SRCI and at the Oregon State Penitentiary. IMU prisoners are separated from the general prison population. IMU provides greater scrutiny of prisoner conduct and potential deprivation of certain prison privileges, such as telephone use, nonfamily visits, outdoor recreation, and classes. Prison officials attempt to use the potential restoration of those privileges—and release from IMU—as a means of inducing prisoners to improve their behavior in prison. From the state's perspective, placement in IMU is not punishment, but rather a security matter related to the needs of safely administering the prison.

> "Maximum custody inmates shall be assigned to an IMU or IMU status cell. * * * An inmate demonstrates the need for maximum custody housing by demonstrating behaviors that cannot be controlled in other housing as indicated by high severity and/or chronic misconduct sanctions, escape activity or security threat group activities causing serious management concerns."

OAR 291-055-0019(1). As a prison official explained:

> "IMU was developed as a system for dealing with inmates who would not conform their behavior to the requirements of a penal institution. Placement in IMU is for an indeterminate period of time, with the inmate having control over when they will be released from IMU. One of the fundamental considerations in creating IMU was that inmates be able to 'program out' based on their behavior and programming while in the IMU."

Petitioner himself admits that IMU placement is based on an inmate's behavior.

In July 2003, petitioner was transferred back to TRCI, which does not have an IMU. In September 2003, officials accused petitioner of fighting with a prisoner named Yancey. A prison guard also alleged that petitioner swung at

her with a closed fist. Prison officials held a hearing regarding those two incidents. Petitioner declined to attend the hearing, but alleged in his habeas petition that no evidence showed that he was responsible for the fight with Yancey. Following the hearing, prison officials placed petitioner in the TRCI Disciplinary Segregation Unit (DSU) for 180 days. Officials then sent petitioner back to the IMU at SRCI. Petitioner maintains that his "IMU placement was therefore an extension of [his] DSU punishment." Petitioner asserts that his appeal from placement in IMU was denied, but the petition is unclear as to the date of that denial.[1]

Petitioner asserts that, in September 2004, the conditions in which he was held deteriorated after his transfer to "A-pod" within IMU. He then states:

"After approximately a week of being subject to the IMU conditions in A-pod and not being told why I was dropped level 1, I became mentally distraught and made a 'shank' out of a stapler from the inmate legal library and flooded the tier with my toilet and had staff suit up. I intended to stab staff when they come through the door."

(Footnote omitted.) Prison officials also suspected petitioner of involvement in a conspiracy to attack prison guards. Finally, petitioner asserts that he slit the throat of another prisoner for being an informant.

To summarize: Prison officials believed that petitioner was involved in gang violence in prison, and petitioner admits both gang involvement and fighting. In an effort to deter further misconduct, officials threatened to send petitioner to IMU if his behavior did not improve. Petitioner continued to fight and otherwise misbehave, and prison officials then placed him in IMU twice.

---

[1] Prison officials also reviewed petitioner's IMU classification on February 15, 2006, but decided not to change his IMU placement. According to the state, petitioner chose not to seek administrative review of that classification, even though such review was available to him. On August 15, 2006, officials again reviewed petitioner's placement in IMU, and ordered testing to consider the possibility of his reassignment from IMU, but pending such an evaluation his classification remained at "level five," the maximum level for disruptive inmates. The record does not reflect whether petitioner sought administrative review of the August 2006 decision, nor does it reflect additional reviews in the Oregon prison system.

## II.  PROCEEDINGS BELOW

Petitioner filed a petition for a writ of habeas corpus alleging the facts described above. Petitioner identified six claims for relief in his petition, but the common element in all of them is his claim that prison officials took actions with respect to him in violation of his procedural due process rights. In particular, petitioner asserts that placement in IMU is punishment and that prison officials violated his due process rights by placing him in IMU without first holding a hearing.

The trial court dismissed the petition as meritless under ORS 34.370(6) and (7).[2] The court summarized the allegations as follows: petitioner had been placed in IMU on two occasions; the conditions in IMU were oppressive; and petitioner had been subjected to discrimination.[3] The court concluded:

> "Plaintiff alleges that he has unlawfully been placed in the Intensive Management Unit (IMU). There is no constitutional right to placement outside the IMU. The oppressive conditions plaintiff alleges are not actionable in an[ ] action for habeas corpus relief. Allegations of discrimination, even if true, are insufficient to invoke habeas corpus relief."

(Citations omitted.) The trial court dismissed the petition without prejudice. Later, the trial court allowed reconsideration, but adhered to its earlier judgment of dismissal.

Petitioner appealed, and the Court of Appeals affirmed. The Court of Appeals declined to address the trial court's conclusion that petitioner had "no constitutional right to placement outside the IMU[.]" Instead, the court rejected petitioner's claims on the threshold ground that petitioner "was not entitled to raise his challenge in a petition for a writ

---

[2] *See* ORS 34.370(6) ("The court may, on its own motion, enter a judgment denying a meritless petition brought under ORS 34.310 to 34.730."); ORS 34.370(7) ("As used in this section, 'meritless petition' means one which, when liberally construed, fails to state a claim upon which habeas corpus relief may be granted.").

[3] On appeal, petitioner took issue with the trial court's characterization of his claims: "Petitioner has a constitutional right to Due Process in placement in the [IMU]. Petitioner never challenged 'oppressive conditions' [and] never raised the issue of discrimination[.]"

of habeas corpus." *Barrett*, 209 Or App at 298 (footnote omitted). The court relied upon *Penrod/Brown v. Cupp*, 283 Or 21, 28, 581 P2d 934 (1978), for the proposition that one of the two "essential elements" for habeas relief is the "practical inadequacy of an alternative remedy" to meet the need for immediate attention to the constitutional deprivation that a petitioner alleges. The court held that petitioner had the "alternative remedy" of a federal civil rights action under 42 USC section 1983 in which he could assert his due process and other federal constitutional rights and that habeas therefore was not available to him. *Barrett*, 209 Or App at 299-301.

Judge Edmonds concurred in the result. He disagreed with the majority's conclusion that the existence of a federal remedy precluded petitioner's claim, but stated that the trial court correctly had found that petitioner failed to state a habeas claim. In Judge Edmonds's view, whether placement of an inmate in IMU was punishment or not would depend on the facts of each case. Petitioner's claims, even when liberally construed, did not "demonstrate that he is indeed subject to atypical and significant hardships in IMU that differ from the ordinary incidents of prison life[.]" *Id.* at 305. The petition therefore did not state a claim for relief. *Id.*

As noted, petitioner filed a petition for review, which we allowed.

## III. MOOTNESS

In May 2007, while petitioner's petition for review was pending, Oregon prison officials transferred petitioner to the Oklahoma prison system under the Interstate Corrections Compact (ICC). We briefly describe the ICC, before turning to the state's argument that petitioner's transfer to Oklahoma pursuant to that compact renders this case moot.

The ICC provides a means for states to send prisoners to other states to serve their sentences. The signatory states "declare that it is the policy of each of [those] states to provide such facilities and programs on a basis of cooperation with one another, thereby serving the best interests of such offenders and of society and effecting economies in capital expenditures and operational costs." ORS 421.245, Art I. The

purpose of the compact is to "provide for the mutual development and execution of such programs of cooperation for the confinement, treatment and rehabilitation of offenders with the most economical use of human and material resources." *Id.* Prison officials sometimes attempt to break up prison gangs by sending problem prisoners out of state. *See, e.g., Salstrom v. State,* 148 Ariz 382, 714 P2d 875 (Ariz Ct App 1986) (describing circumstances in which Nevada prison officials sent prisoner to Arizona because of his involvement in gang activities and involvement in conspiracy to take staff members hostage).

Under the ICC, transferred inmates remain under the jurisdiction of the sending state and may be returned to the sending state.[4] An inmate still enjoys the legal rights that the inmate would have had in the sending state.[5] In other words, an inmate's rights do not change as a result of the transfer out of state.[6]

■ The state asserts that this case is moot because petitioner, having been transferred to a prison in Oklahoma, now is subject to the rules of that prison system, rather than the rules of the Oregon prison system. The state submitted an affidavit from an administrator in the Oregon prison system, asserting that Oregon officials have given Oklahoma officials no guidance on how to treat the prisoner.

> "[Oregon Department of Corrections (ODOC)] transferred [petitioner] to another state for population management

---

[4] "Inmates confined in an institution pursuant to the terms of this compact shall at all times be subject to the jurisdiction of the sending state and may at any time be removed therefrom for * * * any other purpose permitted by the laws of the sending state[.]"

ORS 421.245, Art IV(3).

[5] "The fact of confinement in a receiving state shall not deprive any inmate so confined of any legal rights which said inmate would have had if confined in an appropriate institution of the sending state."

ORS 421.245, Art IV(5).

[6] "Any inmate confined pursuant to the terms of this compact shall have any and all rights to participate in and derive any benefits or incur or be relieved of any obligations or have such obligations modified or the status of the inmate changed on account of any action or proceeding in which the inmate could have participated if confined in any appropriate institution of the sending state located within such state."

ORS 421.245, Art IV(8).

reasons. * * * ODOC officials did not direct the receiving state to confine [petitioner] in security housing or to house him in any particular unit. Once an agreement is made between two states for the transfer of an inmate under the interstate corrections compacts, the state receiving the inmate has both the authority and the responsibility to review the inmate's history and circumstances and decide how that state will manage the inmate in its corrections system, including the location and type of housing assignment that the receiving state deems appropriate."

Because Oregon has no control over Oklahoma's decision on the manner in which the prisoner should be housed, the state argues, the petition is moot.

Petitioner tells a different story, however, asserting that Oregon officials still have influence over his treatment in Oklahoma. Petitioner states that he was placed in a maximum security unit in Oklahoma that is the equivalent of Oregon's IMU. Petitioner filed a declaration stating:

"On June 5, 2007, I was given a hearing before being placed in 'H-Unit.' I was told at that time that Oregon had ordered the Oklahoma Department of Corrections to keep me in the Maximum Security SHU Housing pursuant to the Interstate Corrections Compact Transfer Contract agreement. I cannot be released from SHU without Oregon's authorization."

In addition, a letter to petitioner from the Oklahoma coordinator for the ICC explained that Oregon officials had determined, at least in part, how Oklahoma prison officials will treat petitioner.

"You will probably remain in Maximum Security for a minimum of one (1) year. After the assessment period, your Case Manager can request a transfer to medium custody through this office. At that time I will ask Oregon for their approval. When I get their okay, you will be allowed to be moved.

"The level system you refer to in Oregon is not the same as the level system in Oklahoma. You will be allowed to promote to Level 3 and possibly Level 4 for privileges only. For time, all of your calculations are performed by the State of

Oregon. I do not control your promotions. Your Case manager and the Unit Classification Committee will determine when you are eligible for Level 3.

"Any rights or privileges that Oklahoma does not offer must be requested from Oregon."

Finally, petitioner submitted a document that he received from an Oklahoma prison official, which states that in the Oklahoma prison system, ICC inmates "are housed either [in] maximum or medium security." In his case, Oklahoma prison officials will not change the prisoner's security level without an instruction from Oregon prison officials: "A reduction to a lower security is not possible without recommendation from [the] assigned Case Manager and written approval from the sending states' Compact Authority."

The state argues that this case is moot because petitioner is now in Oklahoma. As the state notes, in order to qualify for habeas relief, a petitioner must be "imprisoned or otherwise restrained of liberty, *within this state*[.]" ORS 34.310 (emphasis added); *see White v. Gladden*, 209 Or 53, 303 P2d 226 (1956) (habeas petition properly dismissed because, in light of release of prisoner on parole, prison warden no longer had custody). Petitioner is not "within this state" and, more importantly, his custodian is not within this state. Both are in Oklahoma.

The terms of the ICC, however, supplement the ordinary habeas jurisdictional analysis. Petitioner committed his crimes in Oregon, was convicted and sentenced in Oregon, and is serving an "Oregon" sentence. Under the ICC, petitioner cannot be deprived of any legal rights that he would have enjoyed in Oregon. *See* ORS 421.243, Art IV(5) (so stating). Although Oregon officials contend that they have not instructed Oklahoma on the details of how petitioner must be treated, petitioner's declaration and documents indicate that Oklahoma officials, at least in part, will seek agreement from Oregon officials in determining petitioner's treatment in the Oklahoma prison system. Petitioner argues that Oregon prison officials' decision to place him in IMU still has consequences for his treatment in Oklahoma prison, and the evidence before us, while not conclusive, tends to support that claim. Based on the record before us, we cannot conclude that

this dispute is moot. We therefore address petitioner's claims to the extent that they may affect his current incarceration in Oklahoma.[7]

## IV. MERITS OF PETITIONER'S HABEAS CLAIM

■ Petitioner argues that the Court of Appeals erred in holding that petitioner could not pursue habeas relief because he had the "alternative remedy" of a section 1983 claim to vindicate the alleged violations of his federal due process rights. The Court of Appeals relied upon the following passage from *Penrod/Brown*:

> " '[W]e emphasize the two essential elements that must coincide to make the writ of habeas corpus a proper instrument of judicial inquiry [into the circumstances respecting the custody of a prisoner]: The need for immediate attention, if this appears from the urgency of the harm to which the prisoner claims to be exposed or if it is found to be required as a matter of constitutional law, and the practical inadequacy of an alternative remedy to meet this need.' "

*Barrett*, 209 Or App at 299 (quoting *Penrod/Brown*, 283 Or at 28). However, as *Penrod/Brown* makes clear in the sentences immediately preceding the passage quoted by the Court of Appeals, that passage refers to alleged deprivations of a prisoner's legal rights *other* than a prisoner's claim that he has been unlawfully subjected to further "imprisonment or restraint" of his person while in custody. *Penrod/Brown*, 283 Or at 28. In *Penrod/Brown*, this court stated that a habeas writ is available for "two kinds of cases"—those challenging a prisoner's "further" restraint and those alleging other deprivations of a prisoner's legal rights, such as overcrowding, the quality of prison food, and "similar conditions of imprisonment." 283 Or at 27. It was with respect to "this second kind" of habeas claim, *id.* at 28, that this court used the words quoted by the Court of Appeals and emphasized that habeas will lie for such claims only if the petitioner shows the "practical inadequacy of an alternative remedy to meet this need." *Id.*

---

[7] We do not address any post-petition claims that might have arisen solely as a result of petitioner's transfer to and incarceration in Oklahoma.

Here, petitioner specifically disclaims any challenge to general prison conditions and relies precisely on the claim that placement in IMU is a "further 'imprisonment or restraint' of his person," *Penrod/Brown*, 283 Or at 28, that is unlawful because it was imposed in violation of his federal due process rights. Petitioner's claim thus is the kind of claim that traditionally has been cognizable in habeas. *See also Bekins v. Cupp*, 274 Or 115, 117, 545 P2d 861 (1976) (habeas petition was proper procedure to challenge prison officials' placement of petitioner in segregation as alleged violation of due process rights).

Even if a successful section 1983 action could lead to injunctive relief, such as an order that petitioner be released from IMU placement, that alternative remedy does not foreclose petitioner's habeas claim. The wrongful deprivation of liberty by the state, which petitioner alleges here, is a serious claim that justifies immediate judicial attention. The writ of habeas corpus provides a speedy remedy for the deprivation of a specific constitutional right—the right to be free from unlawful imprisonment or restraint—when no other remedy will provide timely relief:

> "If the person is imprisoned or restrained by virtue of any order, judgment or process specified in ORS 34.330 and the person challenges the conditions of confinement or complains of a deprivation of rights while confined, the petition shall * * * [s]tate facts in support of a claim that the person is deprived of a constitutional right that *requires immediate judicial attention and for which no other timely remedy is practicably available to the plaintiff*."

ORS 34.362 (emphasis added). As this court stated in *Bedell v. Schiedler*, 307 Or 562, 566, 770 P2d 909 (1989), "The central characteristic of the writ of habeas corpus is the speed with which it triggers judicial scrutiny." If the petition has legal merit, a judge must issue an order "without delay," requiring the custodian "to show cause why the writ should not be allowed." ORS 34.370(1). "The court or judge before whom the party is brought on the writ shall, immediately after the return thereof, proceed to examine into the facts contained in the return, and into the cause of the imprisonment or restraint of such party." ORS 34.580. "If no legal cause is shown for the imprisonment or restraint, or for the

continuation thereof, the court or judge shall discharge such party from the custody or restraint under which the person is held." ORS 34.590. Few other legal remedies provide such swift relief. Moreover, this court has stated specifically that the mere existence of a *federal* remedy does not deprive a prisoner of the protection of the writ of habeas corpus in state court.[8]

We conclude that the Court of Appeals erred in holding that a civil rights lawsuit for tort damages and injunctive relief is an adequate alternative remedy for a habeas petitioner who alleges an unconstitutional "imprisonment or restraint" of his person.

We turn to the state's alternative argument that, even if petitioner may challenge his IMU placement in a habeas petition, his claim fails. Petitioner's principal constitutional claim is that placement in IMU is a further deprivation of liberty beyond the constraints placed on other prisoners and, therefore, that he was entitled to a hearing *before* he could be placed in IMU. The lack of a hearing before being transferred to IMU, he contends, violated his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[9]

The burden that petitioner must meet is a heavy one. First, because petitioner does not challenge his underlying convictions or imprisonment, he must show that placement in IMU is a *further* restraint on his liberty that

---

[8] This court has focused on the necessity of providing *state* remedies for deprivations of constitutional rights:

"When we emphasized in *Penrod/Brown, supra*, that the use of the writ of habeas corpus to trigger judicial inquiry into conditions of confinement depends on 'the need for immediate attention['] * * * we were referring to timely remedies available under Oregon law. We did not mean remedies available in federal courts for failure of Oregon to live up to federal standards. Oregon is responsible for providing its own remedies for legal deprivations, and in prisoner's cases, this particularly applies to the remedy of habeas corpus guaranteed in Article I, section 23, of the Oregon Constitution. That writ cannot be denied because the prisoner also has turned for help to intervention by federal authority."

*Tarver v. Cupp*, 300 Or 154, 156-57, 707 P2d 572 (1985) (citations omitted).

[9] The Due Process Clause of the Fourteenth Amendment states, in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]"

"imposes atypical and significant hardships in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 US 472, 484, 115 S Ct 2293, 132 L Ed 2d 418 (1995). Second, petitioner must show that the Due Process Clause requires that the state provide him a hearing before being placed in IMU and that the procedures afforded him by the state to challenge his IMU placement are constitutionally inadequate. *See Wilkinson v. Austin*, 545 US 209, 224, 125 S Ct 2384, 162 L Ed 2d 174 (2005) (once liberty interest is established, court considers "what process is due").

As to the first point, petitioner argues that his privileges are curtailed to such an extent in IMU that placement there is punishment and constitutes further deprivation of liberty:

> "In IMU I am denied access to a phone, I am denied my property, denied outdoor recreation, denied visits with non-family, denied canteen, I'm not permitted to leave my cell, I am not permitted educational or learning material as well as a myriad of other denied privileges and rights. This denial is based on punishment and not security concerns."

Accordingly, petitioner contends that he is entitled to a hearing before placement in IMU:

> "Because IMU is a punishment unit my placement in IMU denies me Due Process rights in a hearing, such as a notice in accordance with due process, the right to be heard, the right to question witnesses, to have documentary and physical evidence, and a prompt hearing violates my constitutional rights[.]"

The state responds that the United States Supreme Court has held that placement of a prisoner in disciplinary segregation does not "impose[ ] atypical and significant hardships in relation to the ordinary incidents of prison life," and therefore does not implicate a "liberty" interest for due process purposes. *Sandin*, 515 US at 484. The trial court accepted that argument, and it provided the basis for the trial court's conclusion that petitioner had not stated a claim for relief and for Judge Edmonds's concurring opinion in the Court of Appeals.

*Sandin*, however, involved a 30-day disciplinary sanction, and petitioner argues that placement in IMU is a

more significant deprivation of liberty than was involved in *Sandin*. He asserts that IMU placements may last indefinitely and ordinarily are reviewed only every six months. He contends that, at some of the different "levels" of placement within IMU, an inmate is in solitary confinement, allowed out of his cell less than an hour a day, and denied outdoor recreation and visits with nonfamily members. Petitioner argues that those restrictions impose "atypical" and "significant" hardships on an inmate, compared to the normal incidents of prison life and therefore constitute a further deprivation of a liberty interest protected by the Due Process Clause.

Petitioner relies on a United States Supreme Court case decided after *Sandin*, *Wilkinson*, in which the Court considered a challenge to the procedures for assignment to an Ohio "Supermax" prison, where inmates were kept in solitary confinement, required to remain in their cells 23 hours a day, and banned from eligibility for parole. The Supermax placements were for an indefinite period, subject only to an initial 30-day review and annual reviews thereafter. The Court held that placement in the Supermax prison constituted a further deprivation of liberty beyond that experienced by other inmates in the Ohio prison system and therefore implicated a liberty interest protected by the Due Process Clause. 545 US at 223-24.

From petitioner's allegations and the administrative rules with respect to IMU placement, it is apparent that IMU placement involves a greater restriction on liberty than the 30-day sanction in *Sandin*, but less of a restriction than the solitary confinement in the Ohio Supermax prison at issue in *Wilkinson*. Inmates placed in IMU are initially assigned to "level two" of four program levels, in which the inmate is permitted two visits a month, canteen items, and educational materials that meet security requirements. *See* OAR 291-055-0020(2)(b) (IMU inmates begin at level two): OAR 291-055-0020(1)(b) (description of level two services). Inmates can be demoted to level one, where they are not permitted to have visits, if they engage in behavior that threatens the safe, secure, and orderly operation of the IMU. OAR 291-055-0020(2)(c). Inmates who have no major rule violations and no more than one minor rule violation for two months at level

two are advanced to level three, which allows more visits and other privileges. OAR 291-055-0020(2)(d). Similar good behavior for three months leads to advancement to level four and then to review within 30 days for transfer out of IMU. *Id.*; OAR 291-055-0031. The state therefore asserts that IMU placement (and changes in levels within IMU) is based on inmate behavior and is more fluid and less harsh than Supermax placement. For that reason, the state argues, IMU placement does not infringe any protected liberty interest.

■■     We need not decide, however, whether petitioner's IMU placement deprives him of a protected liberty interest because, even assuming that it does, his claim fails the second part of the test for demonstrating a due process violation. The process required by the Due Process Clause depends on the nature of the individual's interest that is at stake, the risk of an erroneous deprivation of that interest given the procedures used by the state, and the state's interest. *Wilkinson*, 545 US at 224-25 (citing *Mathews v. Eldridge*, 424 US 319, 335, 96 S Ct 893, 47 L Ed 2d 18 (1976)). In *Wilkinson*, the Court, as noted, held that placement in the Ohio Supermax prison was an infringement of a liberty interest, but also concluded that due process requirements could be satisfied by "informal, nonadversary procedures * * *." *Wilkinson*, 545 US at 229. The Court in *Wilkinson* indicated that notice of the factual basis for the placement and a fair opportunity for rebuttal were "among the most important procedural mechanisms" to avoid erroneous decisions, *id.* at 226, but it declined to require Ohio to allow an inmate to call witnesses or to provide "other attributes of an adversary hearing." *Id.* at 228. Although the Ohio procedures approved in *Wilkinson* included an informal, nonadversary hearing before an inmate was placed in the Supermax prison, nothing in the Court's decision suggested that due process *required* a hearing before placement. Indeed, the Court in *Wilkinson* cited its earlier decision in *Hewitt v. Helms*, 459 US 460, 472, 103 S Ct 864, 74 L Ed 2d 675 (1983), as "provid[ing] the appropriate model" for procedures in prisons and as "instructive" for that decision's "discussion of the appropriate level of procedural safeguards." *Wilkinson*, 545 US at 229.

In *Hewitt*, the Court held that the prison officials who placed the inmate in that case in administrative confinement "were obligated to engage only in an informal, nonadversary review of the information supporting [the inmate's] administrative confinement, including whatever statement [the inmate] wished to submit, within a reasonable time *after* confin[ement]." 459 US at 472 (emphasis added). *See also id.* at 476, 476 n 8 (due process requires some notice of charges on which administrative segregation is based and opportunity for inmate to present his views; proceeding must occur within reasonable time after transfer).

Oregon provides inmates placed in IMU with procedures to challenge their placement that are similar to those that the Court found sufficient in *Wilkinson* and *Hewitt*. Oregon inmates receive preplacement written decisions regarding their classification and assignment and are provided with notice of their opportunities to seek review. OAR 291-055-0019(4). An Oregon inmate can seek administrative review of an IMU placement and submit a statement and other evidence in support of the inmate's position. OAR 291-055-0019(5); OAR 291-104-0035. The inmate initiates administrative review by submitting a request to the administrator of the classification unit, OAR 291-104-0135(2)(c), and review is then conducted by the Special Population Management-Inmate Program Committee, OAR 291-104-0111(22). Moreover, IMU placements, and changes in the privileges that are granted or denied to IMU inmates, are based on specific criteria, such as the inmate's type of offense, misconduct in prison, affiliation with "security threat gangs," time until release, escape risk, and other factors, thus limiting the chance of erroneous placement decisions. *See* OAR 291-104-0116, Attachment 1 (Custody Classification Guideline); OAR 291-055-0019 to 291-055-0020 (criteria for IMU assignment and programming levels); OAR 291-104-0116 (criteria for determining custody level classification). IMU placements, like other custody level determinations, are reviewed every six months. OAR 291-104-0125.

The state does not provide a formal, preplacement hearing of the kind petitioner seeks before an inmate is placed in IMU or is "demoted" from an initial IMU level two to the more restrictive IMU level one. However, as noted, the

Court in *Wilkinson* held that a formal, adversary hearing was not required, and while the Ohio procedures upheld in *Wilkinson* included an informal hearing prior to transfer, the Court did not indicate that a prior hearing was constitutionally mandated. Rather, the Court referred to *Hewitt*, where it had held that notice and an opportunity to submit a written statement within a reasonable period as part of an administrative review after an inmate's transfer to administrative segregation satisfied due process. That procedure is particularly likely to be sufficient to prevent erroneous IMU placement because the criteria for the maximum custody classification that is a prerequisite for IMU placement are specific and generally objective.

In any event, petitioner himself alleges that the state conducted a hearing with respect to the February 2003 fight that led to petitioner's 180-day administrative segregation and also conducted a hearing (which petitioner declined to attend) related to the September 2003 fight that led to his placement for 180 days in a disciplinary segregation unit. The factual issues related to those fights are the primary basis for petitioner's challenge to his IMU placement. In addition to hearings related to two of the fights in which petitioner was involved, the state provided him preplacement notice of the reasons for his IMU placement and an administrative review, which permitted him to submit evidence in support of his objection to that placement. Defendant does not challenge the promptness of that review.

For the reasons set forth above, on the facts set forth in the petition and the due process challenges this petitioner makes, we conclude that the petition failed to state a claim for relief and that the trial court properly dismissed the petition as meritless under ORS 34.370(6) and (7).[10]

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

[10] Our decision is based on the allegations in the petition and on the written procedures regarding the basis for IMU placements and the process by which placement decisions are made and reviewed. If an inmate were to demonstrate that those procedures were ignored in practice, resulting in harm to an inmate's liberty interest, that could be the subject of an appropriate further challenge.

# PETITIONS FOR REVIEW

### (178 P3d 248, 249)

## ALLOWED

### February 13, 2008

Drazil v. Farmers Insurance Company of Oregon (A130403)(S054508)(210 Or App 464). Petitioner's petition for review is allowed. The decision of the Court of Appeals is vacated, and this case is remanded to the Court of Appeals for reconsideration in light of *Grisby v. Progressive Preferred Ins. Co.*, 343 Or 175, 166 P3d 519, *modified and adh'd to on recons*, 343 Or 394, 171 P3d 352 (2007). *See* 219 Or App 663, 184 P3d 1164 (2008).

### February 14, 2008

State v. Castilleja, Amber Serenity (A127255/56)(S055472)(215 Or App 235)

## DENIED

### February 13, 2008

Baker, Stephen B. v. Gower (A126896)(S055496)(215 Or App 500)

Banks, Michael Dean v. Hill (A130675)(S055545)(215 Or App 702)

Brown, Alvin Harold v. Belleque (A129766)(S055498)(215 Or App 500)

Burgueno, Victor Rivera v. Hill (A134289)(S055629)(217 Or App 428)

Fanning, Paul Cardew v. Hall (A131238)(S055480)(215 Or App 500)

Fletcher and O'Kain (A125770)(A126003)(S055533)(214 Or App 585)

Giberson v. Kaiser Foundation Health (A132073)(S055404)(214 Or App 699)

Gillham and Gillham (A130205)(S055338)(214 Or App 699)

Groepper v. City of Portland (A130194)(S055421)(214 Or App 699). Durham, J., would allow.

Krohn, Gary Lou v. Blacketter (A132535)(S055646)(217 Or App 428)

Melendy, Michael D. v. Hill (A131417)(S055499)(215 Or App 501)

Moore, Rodney Decourse v. Hill (A131000)(S055471)(215 Or App 500)

Reeves, Walter Ralph v. Belleque (A130678)(S055490)(215 Or App 501)

Reigard, Jesse Frank v. Hill (A130192)(S055469)(215 Or App 500)

Sause v. Safeco Insurance Company of Oregon (A132180)(S055409)(215 Or App 112)

Sebastian-Leon, Arturo v. Czerniak (A127737)(S055542)(215 Or App 703)

Snodgrass, James Lowell v. Hill (A131782)(S055455)(215 Or App 359)

State ex rel Department of Human Services v. K. D. H. (A135301-03)(S055484)(215 Or App 359)

State ex rel Juvenile Department of Multnomah County v. K. A. (A135466) (S055612)(216 Or App 192)

State ex rel Juvenile Department of Multnomah County v. P. S. (A135211) (S055521)(215 Or App 500)

State v. Beaman, Steven Allan (A125644)(S055565)(216 Or App 181)

State v. Blankenship, Angel May (A128879)(S055488)(215 Or App 112)

State v. Bosovik, Ivan (A129572)(S055603)(215 Or App 698)

State v. Brostrom, Julie Ann (A123965)(S055510)(214 Or App 604)

State v. Carr, Michael John (A129427)(S055453)(215 Or App 306)

State v. Coffin, Christopher York (A127202)(S055531)(215 Or App 703)

State v. Corra, Dale Arthur (A130735)(A130749)(S055465)(215 Or App 501)

State v. Curl, Thomas Leroy (A126599)(S055536)(214 Or App 571)

State v. Dodds, Jeremy Leroy (A129340)(S055574)(216 Or App 192)(petition and *pro se* petition)

**(178 P3d 249)**

State v. Falco, Tabatha Renee (A127651)(S055449)(215 Or App 501)
State v. Lange, Chris Soren (A129199)(S055378)(215 Or App 359)
State v. Mallory, Shelley Dawn (A126857)(S055570)(213 Or App 392)
State v. Olivar, Julio Cesar (A130715)(S055576)(216 Or App 126)
State v. Simington, Carl Lee (A124973)(S055539)(215 Or App 703)
State v. Sodaro, James Patrick, Jr. (A130809)(S055627)(216 Or App 336)
State v. Travalini, Michael Arlie (A125604/05)(S055511)(215 Or App 226)
State v. Weber, Martin (A131478)(S055605)(216 Or App 555)
State v. Williams, Jeana F. (A124542)(S055461)(212 Or App 219)
State v. Williams, Tonia Lynn (A131666)(S055504)(216 Or App 192)
Stokes, Edward H. v. Hill (A133797)(S055481)(216 Or App 193)
Virakitti, Daothong v. Blacketter (A132065)(S055595)(217 Or App 411)
Zastera, Jerry Lee v. Blacketter (A132316)(S055623)(217 Or App 428)