No. 62          February 4, 2026          801

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

TARA ELLYSSIA ZYST,
*Plaintiff-Respondent,*

*v.*

Jamie MILLER,
*Defendant-Appellant.*

Malheur County Circuit Court
19CV19556; A183152

Jenefer Stenzel Grant, Senior Judge.

Argued and submitted July 23, 2025.

Kyleigh Gray argued the cause for appellant. Also on the opening brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General. Also on the reply brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Margaret Huntington argued the cause for respondent. Also on the brief was Equal Justice Law.

Before Kamins, Presiding Judge, Jacquot, Judge, and Armstrong, Senior Judge.

KAMINS, P. J.

Cellmate and psychiatric care orders reversed; otherwise affirmed.

**KAMINS, P. J.**

Defendant, the Superintendent of Snake River Correctional Institution (SRCI), appeals a general judgment and orders granting in part and denying in part plaintiff's petition for habeas corpus relief. After a habeas trial, the court determined that defendant's medical treatment of plaintiff's gender dysphoria and the decision to house plaintiff in a form of segregated housing referred to as the Intensive Management Unit (IMU) violated state and federal constitutional prohibitions against cruel and unusual punishment and unnecessary rigor. In addition to the relief granted in the general judgment, the court granted plaintiff other relief, including an order to provide a psychiatric evaluation of plaintiff and orders related to finding an appropriate cellmate.

On appeal, defendant raises four assignments of error. The first two concern defendant's medical treatment of plaintiff's gender dysphoria. As explained below, we affirm the court's determination that defendant's treatment of plaintiff's gender dysphoria inflicted cruel and unusual punishment and violated the prohibition against unnecessary rigor. Under the third assignment of error, we do not address whether housing plaintiff in the IMU violated the state constitutional prohibition against unnecessary rigor because defendant does not challenge the court's ruling that it inflicted cruel and unusual punishment. Under the fourth assignment of error, which concerns remedies, we agree with defendant that the court's cellmate and psychiatric care orders exceeded the scope of permissible relief for the harms identified in this case. We therefore reverse those orders but otherwise affirm the general judgment and the orders at issue in this appeal.

## I. STANDARD OF REVIEW

We review a court's judgment granting habeas corpus relief for errors of law. *Alexander v. Gower*, 200 Or App 22, 24, 113 P3d 917 (2005), *rev den*, 340 Or 34 (2006). "To the extent that the trial court's factual findings are supported by evidence in the record, those findings will not be disturbed." *Id*.

## II.   FACTS

After a 1995 conviction for two counts of aggravated murder, plaintiff began serving her sentence in the Oregon Department of Corrections (ODOC). Plaintiff is currently serving a life sentence. Plaintiff identifies as female and has changed her name to suit her gender identity. She is transgender and has been diagnosed with gender dysphoria. As a result of her gender dysphoria, plaintiff has attempted suicide and engaged in acts of self-harm.

In May 2019, plaintiff commenced a habeas corpus proceeding which advanced five claims. Only two of them are at issue here: those relating to the medical treatment of plaintiff's gender dysphoria and the decision to house plaintiff in the IMU.[1] In her third and fifth claims, plaintiff alleged that defendant's medical treatment of her gender dysphoria and the failure to provide adequate conditions of segregation violated constitutional prohibitions against cruel and unusual punishment and unnecessary rigor.

At her habeas trial in October 2023, plaintiff testified, and her witnesses included a psychiatrist, Dr. Caroline Fisher, as well as two psychologists who testified by declaration. On behalf of defendant, the court heard testimony from Captain William King, the Prison Rape Elimination Act (PREA) Compliance Manager at SRCI; Greg Jones, the Interim Administrator of the Office of Population Management and Chair of the Transgender and Intersex Committee (TAIC) for ODOC; Christy Hutson, an assistant administrator of ODOC Behavioral Health Services (BHS); Dr. Warren Roberts, the medical director of ODOC; and Krystal Lentz, a registered nurse who worked for ODOC.

### A.   *Medical Treatment of Plaintiff's Gender Dysphoria*

In her testimony, Fisher explained the symptoms of gender dysphoria for a transgender woman. Such symptoms include feelings of frustration with her masculine appearance, her masculine voice, and her male body and generally

---

[1] Plaintiff withdrew her first claim for relief, which challenged prison measures to prevent the spread of the COVID-19 pandemic. After trial, the court denied plaintiff's second and fourth claims, which alleged failure to protect plaintiff and inappropriate discipline, and plaintiff has not challenged those rulings on appeal.

involve feeling "uncomfortable with your gender expression as it exists right now."

The risks of gender dysphoria include suicide and self-harm. According to Fisher, plaintiff had "attempted suicide 19 times, 18 of which have been while in DOC custody, the most recent of which have been in the past six months." Plaintiff herself testified that she tried to kill herself in late July 2023 by taking all her medication at once "and it was mainly because I have hair on my body that constantly annoys me that shouldn't be there."

For the standard of care for treatment of gender dysphoria, Fisher relied on guidelines from the World Professional Association of Transgender Health (WPATH). Fisher acknowledged that defendant provided plaintiff with some forms of treatment recommended by the WPATH guidelines, including hormone therapy, the ability to purchase mascara and makeup, and defendant also provided constriction undergarments, breast forms, written materials regarding vocal feminization, and defendant approved plaintiff for use of an electric razor. In October 2022, plaintiff participated in a surgical consultation with a doctor at OHSU regarding a vulvoplasty or vaginoplasty, and ODOC's Gender Non-Conforming Therapeutic Level of Care (GNC-TLC) committee approved plaintiff for surgery. However, by the time of trial, the surgery had not been scheduled because the waitlist was long.

In addition, Fisher testified about other kinds of treatment that plaintiff was seeking but had not received, including permanent hair removal, wigs, shapewear, vocal training, facial feminization surgery, surgeries to achieve "a more feminine shape," a hair transplant, and a change in hormonal medication. In her testimony, plaintiff confirmed that she sought those treatments and that she would "accept an independent assessment" to determine which kinds of treatment or therapies were most appropriate in her case.

Fisher testified that there are "400 different surgeries listed as possible surgeries in the WPATH guidelines, as well as probably a greater number of behavioral interventions of varying kinds." When asked which forms

of treatment were medically necessary for plaintiff, Fisher explained,

> "If we're talking about WPATH standards, the answer is potentially all of them. It is very much individualized— WPATH really recommends a very much individualized assessment of the gender dysphoria, the areas which are particularly meaningful or problematic to the individual, and then using a norm-validated scale following the effectiveness of each intervention.
>
> "Q   And so sitting here today, are you able to provide that individualized assessment for Ms. Zyst and what she is requesting?
>
> "A   I'm not."

Fisher testified that plaintiff needed that assessment, and Fisher did not believe that anyone at ODOC was qualified to provide it.

At trial, plaintiff relied on Exhibit 6, a document called "ODOC Clinical Guidelines for Gender Dysphoria," which pointed out that hormone therapy "may be considered medically necessary," but that some other procedures and surgeries, including permanent hair removal and voice therapy or surgery, "will not be considered medically necessary" because they "are deemed cosmetic."

Roberts, the medical director of ODOC, testified that ODOC works with OHSU for surgeries that are part of gender-affirming care. Roberts explained that, after issuance of the most recent WPATH standards, "we have moved towards a more individualized, case-by-case evaluation of our patients so that we don't have a policy or directive that says, 'We will not do X.'" Roberts testified:

> "Well, I believe that, historically, there have been decisions that were made prior to the most recent WPATH standards that came out where, if a procedure was considered cosmetic, it's likely that the—our utilization review or TLC [committee] would not approve it.
>
> "But now, as I said, we're going more towards an individualized, case-by-case, and not making any determinations up front but really determining what is going to assist the patient with their gender dysphoria and then utilizing our

community partners to decide the best, you know, course of surgery in this case going forward.

"And that—I wish I could give you the specifics of it. It's more of an evolution over time. And, I think, if you were to say, like, 'When did that start?' I would say late last year, sort of coming into this year, as we started to engage more with OHSU and expanding our program."

Roberts testified that Exhibit 6, the document listing prohibited treatments, is "no longer DOC policy." He explained that the exhibit was not a "formal policy or procedure; rather, a directive from the previous medical director." According to Roberts, "[W]e've moved away from that. As I said before, it's more of an individualized approach and not really ruling things out up front and creating policies that deny surgical procedures for our patients." However, Hutson, an assistant administrator of ODOC BHS, testified that, although Exhibit 6 was an "old document," it was "[s]omewhat" consistent with defendant's policy toward the treatment of gender dysphoria at the time of plaintiff's habeas trial.

B.  *Housing Plaintiff in the IMU*

When plaintiff first came to SRCI in March 2022, she was initially placed in special housing due to the COVID-19 pandemic. Plaintiff was then moved to a single cell in the general population. Typically, new adults in custody (AICs) are "just housed with whoever they cell-match with," but due to plaintiff's "gender identification and her issues that she's had at other facilities," King, the PREA Compliance Manager at SRCI, worked with plaintiff to identify an appropriate cellmate. However, plaintiff had "issues" with the cellmates proposed by King.

Around January 2023, plaintiff wrote a letter to officials "indicating threats of violence against cellmates or potential cellmates." Plaintiff wrote that if prison officials put "'anyone in this cell with me, a rapist, pedophile, or male AIC, I will paint the cell with their blood and then slit my own throat, and you will have two corpses on your hands.'" That letter resulted in a "misconduct report," and plaintiff was moved into Disciplinary Segregated Housing (DSU) at SRCI.

In March 2023, plaintiff was transferred from DSU to the Behavioral Health Unit (BHU) at the Oregon State Penitentiary, which was "treatment-based, rather than punitive." Around July 2023, plaintiff returned to SRCI and was placed in the Intensive Management Unit or IMU, where she remained at the time of trial. King testified that "AICs do not freely move about in the IMU unit. It's a heightened-security area." The IMU is reserved for AICs who "pose a security threat to the safety and security of the facility." Jones, the administrator of the Office of Population Management, described the IMU as "max custody."

Plaintiff testified that when she was first moved to the IMU, she "felt great despair," "loneliness and isolation," and experienced hallucinations. In the IMU, plaintiff was permitted to shave only three times per week, and she went for weeks without hormones. Plaintiff tried to kill herself in the IMU by ingesting all her medication at once. Fisher recommended that plaintiff be taken out of segregated housing.

C.   *The General Judgment and Other Orders*

At the end of trial, the court took plaintiff's habeas claims under advisement but also made several oral orders. The court ordered defendant to remove plaintiff from the IMU, that plaintiff was not to be housed with a male, cisgender sex offender without written consent from her attorney, that defendant should provide plaintiff with access to feminizing undergarments free of cost, and that defendant should identify outside providers to conduct a gender-care assessment and permanent facial hair removal.

The court held subsequent hearings, including compliance hearings. On December 11, 2023, the trial court entered a letter opinion, which granted relief on plaintiff's third and fifth claims, but denied relief on plaintiff's other claims. Under the third and fifth claims, the court determined that defendant's failure to provide gender-affirming care and housing plaintiff in the IMU violated constitutional prohibitions against cruel and unusual punishment and unnecessary rigor.

Specific to the third claim, the court ordered ODOC to provide plaintiff, at no cost to her, feminizing

undergarments and a wig, schedule "permanent facial hair removal," find an outside provider to conduct a "gender affirming care assessment," and obtain a psychiatric evaluation. The court also prohibited ODOC from housing plaintiff "in a cell with a cis gender male sex offender without written consent" from plaintiff's attorney. Under the fifth claim, the court ordered defendant to move plaintiff out of the IMU.

When the general judgment was entered on December 15, 2023, it included additional orders. Plaintiff's counsel was to select "a gender-affirming care provider" and "a psychiatrist to provide a psychological evaluation" and submit the selections to defendant. The court ordered defendant "to identify an appropriate cell mate" for plaintiff, subject to approval by plaintiff and her counsel. The general judgment also required defendant to identify "a community provider of permanent facial hair removal" and to inquire whether they offered hair transplantation. However, the court stated that defendant was no longer required to provide "silicone hip and buttock padding, or a wig."

Defendant appealed from the general judgment and filed amended notices of appeal after compliance hearings in March 2024. On appeal, the Appellate Commissioner granted in part and denied in part defendant's motion to stay, denying the motion for a stay relating to the "care-related orders," but granting the request for a stay as to the cellmate orders.

## III.   ANALYSIS

On appeal, defendant raises four assignments of error. First, defendant argues that the court did not apply the correct legal standard for cruel and unusual punishment when assessing the first count of plaintiff's third claim for relief relating to treatment of her gender dysphoria. In the second and third assignments, defendant argues that the court did not apply the correct legal standard for unnecessary rigor when addressing the second count of plaintiff's third and fifth claims relating to treatment of gender dysphoria and the conditions of segregation. In the fourth assignment of error, defendant argues that the court's

cellmate and psychiatric care orders exceeded the scope of permissible relief in this case.

We do not address defendant's third assignment of error—under which defendant argues that the court did not apply the correct standard of unnecessary rigor when assessing the decision to place plaintiff in the IMU—because defendant does not challenge the court's determination that the same decision also inflicted cruel and unusual punishment, as alleged in the first count of plaintiff's fifth claim. Therefore, even if we were to agree with defendant that the decision did not amount to unnecessary rigor, it would not result in reversing the court's determination that plaintiff should not be housed in the IMU. In other words, because addressing the legal question would have no practical effect, we do not reach it. We focus instead on defendant's other arguments.

A.   *Cruel and Unusual Punishment*

In the first count of plaintiff's third claim for relief, she alleged that defendant's medical treatment of her gender dysphoria violated the constitutional prohibition against the infliction of cruel and unusual punishment. Defendant does not dispute that plaintiff's gender dysphoria is a serious medical need, a decision that we accept as well taken under these circumstances. Rather, in the first assignment of error, defendant argues that the court erred in determining that defendant was deliberately indifferent to plaintiff's condition. We conclude that the court did not err.

Article I, section 16, of the Oregon Constitution provides in part that "[c]ruel and unusual punishments shall not be inflicted[.]" To prevail on a claim for habeas corpus relief under Article I, section 16, an AIC must show the existence of "a serious medical need that has not been treated in a timely and proper manner and that prison officials have been deliberately indifferent" to it. *Billings v. Gates*, 323 Or 167, 180-81, 916 P2d 291 (1996). The Oregon Supreme Court has explained that the standard under the state and federal constitutions is the same, and it adopted the standard set forth in *Estelle v. Gamble*, 429 US 97, 106, 97 S Ct 285, 50 L Ed 2d 251 (1976).

That standard consists of an objective and a subjective component. *Billings*, 323 Or at 180. The objective element requires proof that the AIC has a serious medical need that has not been treated in a timely and proper manner. *Id*. The subjective element requires proof of deliberate indifference by prison officials. *Id*.

With respect to the subjective element, "even if conduct (or a failure to act) causes pain and suffering, Article I, section 16, forbids it only if it is a form of punishment that is 'inflicted,' that is to say—it is not the result of a happenstance or even negligence." *Id*. In addition, an "honest difference of medical opinion about correct diagnosis and necessary treatment" does not satisfy the second element of the test. *Id*. at 181. Deliberate indifference "is not simply a failure to prescribe a course of treatment that the prisoner would prefer, or even that which another doctor might prescribe." *Shelton v. Armenakis*, 146 Or App 521, 524, 934 P2d 512 (1997).

To prevail on a claim involving choices between alternative courses of treatment, an AIC must show that "the chosen course of treatment was medically unacceptable under the circumstances *** and was chosen in conscious disregard of an excessive risk to the prisoner's health." *Toguchi v. Chung*, 391 F3d 1051, 1058 (9th Cir 2004) (internal quotation marks and brackets omitted). Although the deliberate indifference standard is high, it "is not intended to insulate prison staff from judicial scrutiny of decisions made in the course of diagnosing and treating prison inmates." *Billings*, 323 Or at 181; *see Easley v. Bowser*, 306 Or App 460, 466, 474 P3d 915 (2020) (determining that there was a triable dispute of fact as to whether the defendant was deliberately indifferent to the plaintiff's serious medical need when the defendant repeatedly provided the same diagnostic procedures that did not identify a reason for the plaintiff's continuing and worsening back pain).

Defendant argues that "the trial court erred by finding cruel and unusual punishment in this case because ODOC was treating plaintiff's gender dysphoria at the time of trial and there was no evidence in the record to establish that the additional treatments sought by plaintiff were medically necessary." However, there was evidence that

an individualized assessment was medically necessary to determine how to respond to plaintiff's gender dysphoria, and defendant had not provided that individualized assessment. Relying on the WPATH guidelines, both a psychiatrist testifying on behalf of plaintiff and the medical director of ODOC testified regarding the importance of an individualized assessment, yet by the time of trial that assessment had not been provided. *See Woodroffe v. Nooth*, 257 Or App 704, 711, 308 P3d 225, *rev den*, 354 Or 491 (2013) (explaining that "given the nature of the remedy sought in habeas—*viz.*, injunctive relief (and not damages)—the proper temporal benchmark for assessing deliberate indifference is *at the time that the habeas claim is adjudicated*" (emphasis in original)).

The court's finding underlying its determination of deliberate indifference to plaintiff's gender dysphoria is supported by evidence in the record. Rather than employing an individualized approach to determine appropriate interventions, Exhibit 6 prohibited certain kinds of interventions as cosmetic, including "[p]rofessional hair removal." The court found that "the prohibitions listed in Exhibit 6 were active at the DOC at the time of trial." Based on Fisher's and Hutson's testimony, there is some evidence to support that factual finding, so we are bound by it. *See Alexander*, 200 Or App at 24 ("To the extent that the trial court's factual findings are supported by evidence in the record, those findings will not be disturbed.").

Considering the prohibitions listed in Exhibit 6, as well as the evidence that defendant's medical treatment of plaintiff's gender dysphoria conformed to that policy at least to some degree, we conclude that the court did not err in determining that defendant's treatment of plaintiff's gender dysphoria amounted to deliberate indifference. There was no genuine difference of medical opinion regarding the need for an individualized assessment to identify the kinds of interventions that would be appropriate to address plaintiff's gender dysphoria. Yet, by the time of trial, defendant had not conducted that assessment, which was "medically unacceptable under the circumstances," and which indicated a "conscious disregard of an excessive risk" to plaintiff's health. *Toguchi*, 391 F3d at 1058. Thus, the court did not err in its

determination of deliberate indifference to a serious medical need. We therefore reject defendant's first assignment of error.[2]

B. *Unnecessary Rigor*

In the second and third assignments of error, defendant argues that the court did not apply the correct legal standard when addressing the second count of plaintiff's third and fifth claims for relief, which asserted that the treatment of plaintiff's gender dysphoria and housing plaintiff in the IMU violated the state constitutional prohibition against unnecessary rigor. As already explained, we do not address the third assignment of error. However, under the second assignment, we affirm the court's ruling that defendant's treatment of plaintiff's gender dysphoria violated the prohibition against unnecessary rigor.

Article I, section 13, of the Oregon Constitution provides that "[n]o person arrested, or confined in jail, shall be treated with unnecessary rigor."[3] In *Laseur v. Miller*, 345 Or App 33, ___ P3d ___ (2025), we recently held that "when assessing claims of unnecessary rigor in habeas corpus cases, courts should consider whether the prison conditions or treatment are more strict, severe, or harsh than the circumstances require, including whether they are abusive, degrading, or inhumane." *Id.* at 35. Applying that standard—which admittedly was not available to the parties or the court at the time of the habeas trial—we conclude that the court did not err in granting habeas relief to plaintiff relating to the medical treatment of her gender dysphoria.

---

[2] The United States Court of Appeals for the Eleventh Circuit determined that the denial of an AIC's "social-transitioning-related accommodations—specifically, to grow out her hair, use makeup, and wear female undergarments" did not violate her rights under the Eighth Amendment. *Keohane v. Florida Department of Corrections Secretary*, 952 F3d 1257, 1272 (11th Cir 2020). However, in that case, "the testifying medical professionals were—and remain—divided over whether social transitioning is medically necessary to Keohane's gender-dysphoria treatment." *Id.* at 1274. By contrast, here, there was no evidence of a difference of medical opinion regarding the necessity of an individualized assessment to treat plaintiff's gender dysphoria.

[3] There is no federal counterpart to the state constitutional prohibition against unnecessary rigor. In addition to Oregon, four other states—Tennessee, Indiana, Utah, and Wyoming—have unnecessary rigor provisions in their state constitutions. *Laseur v. Miller*, 345 Or App 33, 48, ___ P3d ___ (2025).

In arguing that the court incorrectly applied the prohibition against unnecessary rigor, defendant argues that "if a medical condition or course of treatment is the subject of reasonable dispute between medical experts, then following one course or the other cannot be abusive * * *." But, as explained above, there was no difference of medical opinion regarding the need for an individualized assessment of plaintiff's gender dysphoria to determine the medical interventions that would be appropriate in her case. Both Fisher and Roberts testified that it was appropriate. No one testified that it wasn't. Plaintiff therefore met her burden to show that the failure to provide that individualized assessment was "contrary to the consensus of medical professionals for treatment of the condition." *Laseur*, 345 Or App at 50. The treatment of plaintiff's gender dysphoria was more strict, severe, or harsh than the circumstances required, and the record does not explain why that individualized assessment had not occurred by the time of trial. We affirm the ruling granting relief under the second count of plaintiff's third claim.

C.   *The Scope of Permissible Relief*

In the fourth and final assignment of error, defendant argues that the court's cellmate and psychiatric care orders exceeded the scope of permissible relief. More specifically, defendant argues that those orders were not related to treatment of plaintiff's gender dysphoria and were "outside of the scope of the trial court's authority to remedy the specific constitutional violation alleged" in the third claim for relief. Defendant also argues that the court's post-trial orders, including the orders to identify an appropriate cellmate for plaintiff, "exceeded the scope of the court's authority to ensure compliance with its prior orders."

Plaintiff responds that, under her fifth claim, which concerned the conditions of segregation, she alleged that it was improper for an AIC with her mental health conditions to be housed in the IMU. According to plaintiff, "[a]s the issues developed at trial, the court recognized that adequate gender dysphoria treatment was intertwined with plaintiff's physical safety and with diagnosis and treatment of her other psychological conditions which, in turn, affected

where DOC could house her." Plaintiff also argues that the court had authority to modify its cellmate orders, and, if there was any error, that defendant invited it.

We are not persuaded by plaintiff's arguments. We conclude that the court's psychiatric care and cellmate orders did exceed the scope of permissible relief.

We review orders relating to the relief in a habeas corpus case for legal error. *See Alexander*, 200 Or App at 24 (reviewing the court's entry of judgment directing the defendant to release the plaintiff from custody for errors of law). ORS chapter 34 governs habeas corpus proceedings. *Bedell v. Schiedler*, 307 Or 562, 565, 770 P2d 909 (1989). Under ORS 34.670, a court may grant habeas relief "to dispose of the party as the law and justice of the case may require." That statute is "construed broadly to achieve the remedial purpose of the [habeas] statutes." *Shipman v. Gladden*, 253 Or 192, 204, 453 P2d 921 (1969).

The habeas corpus statutes do not expressly address the permissible scope of relief in a case like this one, which is based on claims of unconstitutional conditions of confinement. In *Penrod/Brown v. Cupp*, 283 Or 21, 24-25, 581 P2d 934 (1978), the Oregon Supreme Court recognized that AICs incarcerated pursuant to valid judgments of conviction may nonetheless suffer from illegal restraints on their liberty and that they can utilize the writ of habeas corpus to challenge the legality of those restraints. At the same time, the court has endeavored to distinguish the writ from "other kinds of claims for which another remedy available to prisoners is adequate," and a "central characteristic of the writ * * * is the speed with which it triggers a judicial inquiry." *Id.* at 26-27; *see also Barrett v. Belleque*, 344 Or 91, 103, 176 P3d 1272 (2008) ("Few other legal remedies provide such swift relief.").

In habeas cases, given the need to provide prompt relief, there must be a close connection between the constitutional violation and the relief ordered to remedy or cure it. ORS 34.310 provides in part that "[e]very person imprisoned or otherwise restrained of liberty * * * may prosecute a writ of habeas corpus to inquire into the cause of such imprisonment or restraint, and if illegal, to be *delivered therefrom*."

(Emphasis added.) Similarly, ORS 34.590 provides that, "[i]f no legal cause is shown for the imprisonment or restraint, or for the continuation thereof, the court or judge shall discharge such party from the custody or restraint under which the person is held." Thus, the relief in habeas cases premised on unconstitutional conditions of confinement should aim to swiftly deliver AICs from those conditions or promptly discharge them from those illegal restraints.[4]

As already explained, we agree with the court that defendant's failure to obtain an individualized assessment of the interventions necessary to treat plaintiff's gender dysphoria violated constitutional prohibitions against cruel and unusual punishment and unnecessary rigor, and defendant has not challenged the court's determination that housing plaintiff in the IMU constituted cruel and unusual punishment. However, the connection between those constitutional violations and the court's psychiatric care and cellmate orders is too attenuated for those orders to qualify as speedy remedies necessary to deliver plaintiff from those unconstitutional conditions or to discharge her from illegal restraints on her liberty.

The court remedied the constitutional violations relating to defendant's medical treatment of plaintiff's gender dysphoria when it ordered defendant to provide an individualized, gender-affirming care assessment for plaintiff as recommended by the WPATH guidelines. And the court remedied the constitutional violation relating to housing plaintiff in the IMU when it ordered defendant to move plaintiff out of the IMU. We are not persuaded that the habeas court had statutory authority to go further and make additional orders requiring defendant to obtain a psychiatric evaluation of plaintiff and to identify an appropriate cellmate for her,

_____

[4] We emphasize that we use the term "discharge" here not in the sense of a release from custody, but rather in the sense of a "discharge" from illegal restraints. *Cf. White v. Reyes*, 335 Or App 124, 136, 558 P3d 43 (2024) (holding that "a habeas court may order an adult in custody's discharge under ORS 34.610(2) when the court has found that prison officials were deliberately indifferent under Article I, section 16, and the Eighth Amendment and the officials' failure to cure the constitutional violation is so significant that the adult in custody's sentence is no longer lawful and instead constitutes cruel and unusual punishment"). Here, we address the scope of what a habeas court can order "to cure the constitutional violation." *Id.*

because those orders were not closely related to promptly delivering plaintiff from the conditions that violated the constitution. *See* ORS 34.310 (stating that if a restraint of liberty is illegal, then the AIC should be "delivered therefrom"); *see also Bedell*, 307 Or at 566 ("The central characteristic of the writ of habeas corpus is the speed with which it triggers judicial scrutiny.").

Contrary to plaintiff's argument that the order for a psychiatric evaluation was related to her fifth claim—which challenged the decision to house plaintiff in the IMU—the court cured that constitutional violation when it ordered defendant to remove plaintiff from the IMU. Under that claim, we are not persuaded that the court could also order defendant to provide a psychiatric evaluation of plaintiff. In addition to going beyond the court's statutory authority to promptly deliver plaintiff from the constitutional violation, it risked making the process of providing relief in this habeas case too open-ended, as evidenced by the numerous subsequent hearings and orders entered after the habeas trial.

The court's orders requiring defendant to identify an appropriate cellmate for plaintiff suffer from similar defects. Plaintiff acknowledges that those orders changed over time but argues that the court had authority to modify its prior orders and that they were necessary to adequately address her gender dysphoria. Once again, the court endeavored to promptly remedy the constitutional violations when it ordered an individualized assessment of the interventions necessary to treat plaintiff's gender dysphoria, and, in our view, the connection between the constitutional violations and identifying an appropriate cellmate for plaintiff was too remote for the various cellmate orders to qualify as necessary to deliver plaintiff from the constitutional violations.

In addition, the various cellmate orders resulted in additional hearings well beyond the scope of plaintiff's original claims, which is contrary to the writ's focus on providing prompt relief for immediate harms. *Penrod/Brown*, 283 Or at 27. Here, the court acknowledged as much during a March 2024 hearing, when it stated that the arguments regarding finding an appropriate cellmate for plaintiff had

"expanded beyond where I thought we were going on that particular point, which was already, to be fair, a little outside the purview of gender-affirming treatment, which was * * * the central issue." To the extent plaintiff argues that defendant invited the error, having reviewed the transcript of the relevant hearings, we are not persuaded by that argument.

Accordingly, we reverse the orders requiring defendant to obtain a psychiatric evaluation of plaintiff and to find an appropriate cellmate for her, but we otherwise affirm the general judgment and orders at issue in this appeal.[5]

Cellmate and psychiatric care orders reversed; otherwise affirmed.

---

[5] Defendant does not argue on appeal that the court's orders relating to permanent facial hair removal and feminizing undergarments go beyond the scope of permissible relief, so we do not address those orders.