No. 986　　　　November 19, 2025　　　　33

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

MICHAEL LEWIS LASEUR,
*Plaintiff-Respondent,*

*v.*

Jamie MILLER,
Superintendent,
Snake River Correctional Institution,
*Defendant-Appellant.*

Malheur County Circuit Court
22CV43857; A182827

Jenefer Stenzel Grant, Senior Judge.

Argued and submitted July 23, 2025.

Carson L. Whitehead argued the cause for appellant. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Margaret Huntington argued the cause for respondent. Also on the brief was Equal Justice Law.

Before Kamins, Presiding Judge, Jacquot, Judge, and Armstrong, Senior Judge.

KAMINS, P. J.

Judgment on Claims 1, 3, 5, and 7 reversed and remanded; judgment on Claim 6 reversed in part and remanded; order dated March 1, 2024, reversed in part; otherwise affirmed.

**KAMINS, P. J.**

Defendant, the Superintendent of Snake River Correctional Institution (SRCI), appeals a general judgment and subsequent order granting relief on plaintiff's habeas corpus claims. Plaintiff was an adult in custody (AIC) who suffered from medical conditions including cervical radiculopathy, chronic pain, and post-traumatic stress disorder (PTSD).[1] After a trial, the court determined that defendant's treatment of those medical conditions was unconstitutional, including because it violated Article I, section 13, of the Oregon Constitution. The court also issued several orders, updated through regular compliance hearings, addressing plaintiff's medical care.

Article I, section 13, provides that "[n]o person arrested, or confined in jail, shall be treated with unnecessary rigor." We hold that, when assessing claims of unnecessary rigor in habeas corpus cases, courts should consider whether the prison conditions or treatment are more strict, severe, or harsh than the circumstances require, including whether they are abusive, degrading, or inhumane. Applying that test, the trial court erred in its application of the unnecessary rigor standard under Claims 6 and 7 of plaintiff's petition, but not under Claim 2. We also conclude that the trial court had no authority to defer rulings or to order relief on deferred or denied counts, and that the trial court lacked authority to order defendant to provide specific dosages of a medication. We therefore affirm in part and reverse in part.

---

[1] While this appeal was pending, plaintiff was released from custody as a contempt sanction. Defendant has separately appealed the contempt judgment. *Laseur v. Miller*, Case No. A186397. We requested supplemental briefing on whether plaintiff's release moots this appeal. We conclude that the superintendent's appeal is not moot because it is likely to have a practical effect on the parties, including the superintendent's obligation to pay attorney fees to plaintiff for services performed in part during the period covered by this appeal. *State v. K. J. B.*, 362 Or 777, 785, 416 P3d 291 (2018); *see Garges v. Premo*, 362 Or 797, 801, 421 P3d 345 (2018) ("Mootness results when a change in circumstance or some intervening event has eliminated the possibility that the requested relief can be provided."); *see also State ex rel Mix v. Newland*, 277 Or 191, 200-01, 560 P2d 255 (1977) (explaining that the defendant could be held in contempt for failing to comply with an invalid injunction, but also concluding that an award of attorney fees was not appropriate under the circumstances).

## I.   STANDARD OF REVIEW

We review a court's judgment granting habeas cor-
pus relief for errors of law. *Alexander v. Gower*, 200 Or App
22, 24, 113 P3d 917 (2005), *rev den*, 340 Or 34 (2006). "To
the extent that the trial court's factual findings are sup-
ported by evidence in the record, those findings will not be
disturbed." *Id.*

## II.   FACTS

In December 2022, plaintiff commenced a habeas
corpus proceeding, alleging that defendant denied him
adequate medical care and treatment in violation of state
and federal constitutional prohibitions against cruel and
unusual punishment and unnecessary rigor.[2] Plaintiff
asserted seven claims for relief, alleging that defendant
failed to properly treat his: (1) hypertension; (2) cervical
radiculopathy; (3) refractory headaches; (4) traumatic brain
injury (TBI); (5) hyperlipidemia and hypercholesterolemia;
(6) chronic pain; and (7) PTSD.

### A.   *Trial*

The court conducted a trial from August 9 to 11, 2023.
Plaintiff testified, as did his expert, Dr. Mark Baskerville,
a medical doctor and anesthesiologist. On behalf of defen-
dant, the court heard testimony from Dr. Michael Wynn,
a neurologist who treated plaintiff, Cristy Hutson, assis-
tant administrator of Behavioral Health Sciences for the
Oregon Department of Corrections (ODOC), and Dr. Wendy
Siegersma, a medical doctor at SRCI.

In closing arguments, plaintiff withdrew Claim 3,
which related to refractory headaches. At the end of trial,
the court took the matter under advisement. Despite not
issuing a ruling, the court did make several oral orders to
address "urgent" matters. The court first ordered defendant
to schedule an "occipital nerve block" as relief on the with-
drawn claim relating to headaches, stating, "I'm not sure
I'm ready to get rid of the headache piece." The court also

---

[2] Article I, section 16, provides in part that "[c]ruel and unusual punishments
shall not be inflicted." The Eighth Amendment to the United States Constitution
also prohibits "cruel and unusual punishments." The federal constitution does
not have an Unnecessary Rigor Clause.

observed that it had, "outside of this trial seen a fair amount of evidence that [plaintiff] can benefit, that [his] specific condition of hyperlipidemia and blood pressure can benefit from a plant[-]based diet." The court recommended that plaintiff read the book *Eat For Life*, and follow a plant-based diet, observing that plaintiff had already lost weight and thus had "sufficient self-discipline and ability to change [his] diet radically." The court ordered defendant to provide a cervical spine MRI, a trial on the medication gabapentin, and a neurosurgical consult.

B.   *The Opinion Letter and General Judgment*

On October 2, 2023, the trial court issued a lengthy letter opinion. Under each claim, plaintiff had asserted two counts, alleging that defendant's treatment of his medical conditions subjected him to cruel and unusual punishment and unnecessary rigor. In broad terms, the court granted relief under Claim 2 (cervical radiculopathy), Claim 6 (chronic pain), and the unnecessary rigor count of Claim 7 (PTSD). The court otherwise denied claims or "deferred" ruling on counts under the remaining claims.

More specifically, under Claim 1, the court acknowledged that "blood pressure management is complicated," and the court denied plaintiff's claim that defendant's treatment of his hypertension amounted to cruel and unusual punishment. However, the court stated that "[b]ecause hypertension is entwined with headaches and chronic pain, *** it is unclear whether [p]laintiff's hypertension is part of a pattern of unnecessary rigor." The court deferred ruling on the count and ordered defendant "to provide a stationary bicycle" and continued monitoring of plaintiff's blood pressure.

On Claim 2, the trial court granted the claim under both counts. Focusing on "the refusal to allow a cervical spine MRI," the court concluded that defendant had been deliberately indifferent to plaintiff's cervical radiculopathy, and the court also concluded that defendant subjected plaintiff to unnecessary rigor. The court ordered a cervical spine MRI, "follow-up consultation with an off-site (i.e., non-DOC) neurosurgeon," and "a consultation from a

neuroradiologist if this expertise is reasonably available in the community."

Under Claim 3, relating to refractory headaches, and even though plaintiff had withdrawn the claim, the trial court deferred ruling on both counts. The court ordered an "occipital nerve block study" for the purpose of determining the origin of plaintiff's headaches. On Claim 4, relating to TBI, the court denied the claim. Under Claim 5, relating to hyperlipidemia and hypercholesterolemia, the court concluded that plaintiff had not shown defendant's treatment of the conditions amounted to cruel and unusual punishment. The court deferred ruling on whether defendant subjected plaintiff to unnecessary rigor and ordered defendant to provide vegetarian meals and fish oil.

On Claim 6, relating to chronic pain, the court granted plaintiff's claim for relief. The court determined that defendant's treatment inflicted cruel and unusual punishment because defendant "intentionally delayed and denied access to recommended care and to treatment." The court also determined that plaintiff's untreated pain was "a cognizable indignity," and that defendant's failure to take "appropriate steps to diagnose and treat that pain" amounted to unnecessary rigor. The court ordered a gabapentin trial, and if it did not provide relief, then "additional appropriate non-opioid medications are to be tried, including baclofen."

On Claim 7, the court concluded that plaintiff failed to show the treatment of his PTSD amounted to cruel and unusual punishment. However, the court granted the claim as to unnecessary rigor, determining that plaintiff's inadequately treated PTSD constituted "a cognizable indignity," and that defendant's failure to provide psychological support lacked necessity. The court ordered monthly counseling, dialectical behavior therapy (DBT), and ordered that defendant should confer with experts at the Veterans' Administration (VA) regarding best practices for treatment of PTSD.

The following chart summarizes the court's rulings, and the relief ordered:

| Claim | Cruel and Unusual Punishment | Unnecessary Rigor | Relief |
|---|---|---|---|
| 1. Hypertension | Denied | Deferred | Stationary bicycle; blood pressure monitoring |
| 2. Cervical radiculopathy | Granted | Granted | MRI; consultation with neurosurgeon |
| 3. Refractory headaches | Deferred | Deferred | Occipital nerve block study |
| 4. TBI | Denied | Denied | |
| 5. Hyperlipidemia/ Hypercholesterolemia | Denied | Deferred | Stationary bicycle; vegetarian meals; fish oil |
| 6. Chronic pain | Granted | Granted | Gabapentin trial and baclofen |
| 7. PTSD | Denied | Granted | Monthly counseling; DBT; consult with VA |

On November 13, 2023, the trial court entered a general judgment restating its rulings and adding that defendant should immediately arrange for a psychiatric evaluation of plaintiff's PTSD from a psychiatrist "skilled in combat-related PTSD."

C.  *Additional Findings and Orders*

After entry of the general judgment, the trial court held several "compliance" hearings. On March 1, 2024, the court entered an order concluding that defendant was in compliance with its orders on Claims 1, 2, 3 and 5, but not on Claims 6 and 7, relating to treatment of plaintiff's chronic pain and his PTSD.

As to Claim 6, the court noted that defendant had not started a gabapentin trial because of plaintiff's "concurrent benzodiazepine therapy." At the time of trial, defendant had been prescribed several medications for pain, including amitriptyline, but, in response to the general judgment, defendant discontinued amitriptyline and prescribed gabapentin, although not in the dosage recommended by plaintiff's expert. The court observed that defendant had reduced

plaintiff's valium dosage, and that, as a result, defendant's "concerns about a gabapentin trial should be largely alleviated." Accordingly, the court indicated that it expected a gabapentin trial to begin before the next hearing. As to Claim 7, the court indicated that defendant "had not been able to find a provider for the psychiatric evaluation skilled in combat-related PTSD."

The court held additional compliance hearings in March, April, and June 2024. In June 2024, the court held defendant in contempt, ordered plaintiff's release from custody and authorized an award of attorney fees. As noted, defendant has separately appealed the contempt judgment. Here, defendant appeals from the general judgment entered on November 13, 2023, as well as from the subsequent order dated March 1, 2024.

## III. ANALYSIS

On appeal, defendant raises five assignments of error. As explained below, we agree with defendant that the court had no authority in a habeas corpus proceeding to defer rulings or to provide relief on deferred or denied counts. We therefore reverse the court's orders providing relief under Claims 1, 3, and 5. Based on our analysis below of the state constitutional prohibition against unnecessary rigor, we conclude that the court did not err under Claim 2, but it did under Claims 6 and 7. We therefore reverse the unnecessary rigor counts under Claims 6 and 7. We further conclude that the court lacked authority to order the specific relief provided under the first count of Claim 6. We therefore affirm in part and reverse in part.

### A.  *Deferred and Denied Counts*

In his first assignment of error, defendant argues that the trial court erred by ordering relief under Claims 1, 3, and 5, because the court either rejected those claims or deferred ruling on them. Plaintiff responds that the trial court granted relief on Claims 2 and 6, that the case involved complex and interrelated medical issues, and that the remedies ordered under deferred claims "were necessary to adequately diagnose and treat the conditions for claims that were granted." We are not persuaded by plaintiff's argument.

Habeas corpus proceedings are governed by statute. *Bedell v. Schiedler*, 307 Or 562, 565, 770 P2d 909 (1989). AICs have a right to conditions of confinement that comply with state and federal constitutional standards. *Barrett v. Peters*, 274 Or App 237, 240, 360 P3d 638 (2015), *aff'd*, 360 Or 445, 383 P3d 813 (2016). The petition must "[s]tate facts in support of a claim that the person is deprived of a constitutional right that requires immediate judicial scrutiny and for which no other timely remedy is practicably available to the plaintiff." ORS 34.362(2). "The central characteristic of the writ of habeas corpus is the speed with which it triggers judicial scrutiny." *Bedell*, 307 Or at 566 (citing *Penrod/Brown v. Cupp*, 283 Or 21, 27, 581 P2d 934 (1978)).

On the filing of a properly pleaded petition, a writ shall issue "without delay." ORS 34.370. After a return to the writ is filed, the court "shall, immediately *** proceed to examine into the facts contained in the return." ORS 34.580. If a replication is filed, the court must proceed "in a summary way" to hear the evidence and decide the case. ORS 34.670. Plaintiffs have the burden of proving their cases by a preponderance of the evidence. *Billings v. Gates*, 323 Or 167, 182 n 18, 916 P2d 291 (1996).

Considering that statutory scheme, we are not aware of any authority—or rationale—allowing for either deferred rulings in habeas corpus proceedings or relief on claims or counts that had been denied. Doing so is not compatible with the statutory emphasis on the speed of the proceedings.

We addressed a somewhat similar request to defer ruling in a habeas corpus case in *Rushin v. McGee*, 156 Or App 481, 965 P2d 498 (1998), *rev den*, 327 Or 607 (2000). In that case, the superintendent requested that we delay our decision because the legal issue raised by the petition was on review in the Supreme Court. *Id.* at 483. We declined that request, reasoning that "[i]t would defeat the purpose of the writ of habeas corpus to defer deciding habeas corpus cases on the ground that the law might change in the future." *Id.* at 483-84. Similarly, here, the trial court should not have deferred any decisions. If the trial court could not determine at the end of the trial that plaintiff had met his

burden of proving by a preponderance of the evidence that he was subjected to either cruel and unusual punishment or unnecessary rigor, then the trial court should have denied the claims, not deferred ruling on them.

In addition to deferred rulings, the trial court also ordered relief on claims that had been deferred, or even denied. The court lacked authority to do so. The procedures to be followed in habeas corpus actions "are those prescribed by the Oregon Rules of Civil Procedure." *Bedell*, 307 Or at 565 (citing *Gage v. Maass,* 306 Or 196, 201, 759 P2d 1049 (1988)). ORCP 67 C provides that "[e]very judgment shall grant the relief to which the party in whose favor it is rendered is entitled." It follows that a judgment cannot grant relief on claims that were not decided in the plaintiff's favor.

Applying that procedural rule, when the trial court failed to find in plaintiff's favor on Claims 1 and 5, then the court could not order relief on those claims. In addition, plaintiff withdrew Claim 3, yet the court ordered relief on that claim. We therefore reverse the court's orders for relief under Claims 1, 3, and 5. Having denied or deferred ruling on the counts under those claims, the court had no authority to order access to a stationary bicycle, continued blood pressure monitoring, an occipital nerve block study, vegetarian meals, and fish oil.

B.   *Unnecessary Rigor*

We turn to the court's analysis of the state constitutional prohibition against unnecessary rigor. In his second, third, and fourth assignments of error, defendant argues that the court did not correctly apply the standard when it granted relief to plaintiff under Claims 2, 6, and 7. Among other things, defendant argues that the court incorrectly relied on plaintiff's status as a military veteran in determining that defendant acted with unnecessary rigor.

In our view, the court's focus on whether plaintiff suffered a "cognizable indignity," a concept that, according to the court, "depends on social and individual psychology and the perception of the general public," resulted in an application of the constitutional test untethered to an objective

standard. We therefore take this opportunity to clarify the meaning of "unnecessary rigor."

When analyzing a constitutional provision, we look to its "specific wording, the case law surrounding it, and the historical circumstances that led to its creation." *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992).

    1.   *Text*

Starting with the text, Article I, section 13, states that "[n]o person arrested, or confined in jail, shall be treated with unnecessary rigor." We presume that the adopters of the constitution understood its words according to their ordinary meaning, and contemporaneous dictionary definitions can provide a helpful starting point in interpreting them. *Wittemyer v. City of Portland*, 361 Or 854, 861, 402 P3d 702 (2017). When used as a verb, dictionary definitions of "treat" include "to deal with or bear oneself toward in some specified way," to "behave or act towards," "to care for (as a patient or part of the body) medically or surgically," and to "deal with by medical or surgical means." *Webster's Third New Int'l Dictionary* 2434-35 (unabridged ed 2002).

"Unnecessary" is defined as "not necessary," "useless," or "needless," and definitions of "necessary" include "unavoidable, inevitable," "that cannot be done without," "that must be done or had," and "absolutely required." *Id.* at 1510-11, 2504. The 1828 edition of the Webster's dictionary expressly defined "unnecessary" by including a reference to unnecessary rigor: "[n]ot necessary; needless; not required by the circumstances of the case; useless; as *unnecessary* labor or care; *unnecessary* rigor." https://webstersdictionary1828.com/Dictionary/Unnecessary, last accessed, November 12, 2025 (emphasis in original).

Definitions of "rigor" include:

> "stiffness, hardness, inflexibility, * * * often harsh inflexibility in opinion, temper, or judgment : SEVERITY, STERNNESS * * * the quality of being unyielding or inflexible : exactingness without allowance, deviation or indulgence : STRICTNESS * * * strictness or severity of life : AUSTERITY * * * an act or instance of strictness, severity, harshness, oppression, or cruelty * * * a condition that makes life difficult, challenging or uncomfortable; *esp* : extremity of cold."

*Webster's* at 1957. Older available definitions are similar. For example, the 1857 edition of Webster's dictionary defined "rigor" as including "[s]tiffness of opinion or temper; severity; sternness," "[s]everity of life; austerity; voluntary submission to pain, abstinence, or mortification," and "[s]trictness; exactness without allowance, latitude, or indulgence." Noah Webster, *An American Dictionary of the English Language*, 957 (1857).

Putting those definitions together, the text of Article I, section 13, indicates that the constitutional prohibition against unnecessary rigor applies to the behavior towards, or care of, AICs, including their medical treatment, but for such treatment to rise to the level of a constitutional violation, it must be more severe or harsh than the circumstances require.

2.  *Case law*

Turning from the text of the constitutional provision to the case law interpreting it, the seminal case is *Sterling v. Cupp*, 290 Or 611, 625 P2d 123 (1981), in which the court held that the Unnecessary Rigor Clause is aimed at "minimizing needlessly harsh, degrading, or dehumanizing treatment of prisoners * * *." *Id.* at 622. The court explained that the guarantee against "unnecessary rigor" is not "confined only to such historically 'rigorous' practices as shackles, the ball and chain, or to physically brutal treatment or conditions, though these are the most obvious examples." *Id.* at 619. The provision protects against a practice that "would be recognized as an abuse to the extent that it cannot be justified by necessity." *Id.* at 620.

*Sterling* addressed an injunction against female prison guards conducting nonemergency body searches of male prisoners. *Id.* at 613. Although the lower courts considered whether the practice violated the federal right to privacy, the Supreme Court focused on the state constitutional prohibition against unnecessary rigor. *Id.* at 618-19. Relying on secondary sources of standards for prison searches, and the concept of "personal dignity," the court considered "whether a practice of body searches including sexually intimate areas by officers of the opposite sex, even though the

prisoner remains clothed, constitutes a cognizable indignity and if so, whether it is justified by necessity." *Id.* at 620, 622. The court recognized that "what is or is not an indignity is largely a matter of social and individual psychology." *Id.* at 623. A practice may appear to be an indignity "from the purpose of its imposition, or from the viewpoint of the prisoner, or in the perception of the general public. Moreover, such views may differ widely among individuals and change over time with changing social expectations about the relations between the sexes." *Id.*

The court determined that, under "prevailing social assumptions," prisoners are entitled to be free from unnecessary touching of sexually intimate parts of their bodies, and that Article I, section 13, protects against "a search by corrections officers of the opposite sex that involves touching of sexually intimate body areas even through clothing" unless "the immediate circumstances in a particular situation necessitate it." *Id.* at 624, 632. Therefore, in *Sterling*, the court determined that intrusive searches by women imposed "a needless indignity." *Id.* at 620. However, there is no indication that the *Sterling* court meant for the concept of a "cognizable indignity" to apply outside of the context of addressing the constitutionality of body searches. The more general point was that Article I, section 13, consistent with the plain meaning of its terms as discussed above, is concerned "with minimizing needlessly harsh, degrading, or dehumanizing treatment" of AICs. *Id.* at 622.

The few cases following *Sterling* that broach the topic of "unnecessary rigor" focus on protecting AICs from needlessly harsh conditions or treatment. For example, in *Bedell*, 307 Or at 570, the Supreme Court stated that, under Article I, section 13, AICs are "entitled to an environment that does not unnecessarily subject them to serious health hazards." In *Billings*, 323 Or at 177, the Supreme Court explained that *Bedell* was concerned with the prison environment and protecting AICs from "known serious health hazards."

In *State v. Freudenthaler*, 84 Or App 531, 734 P2d 894, *rev den*, 303 Or 455 (1987), the defendant challenged a statute governing appellate review of his guilty plea,

arguing that the statute violated the Unnecessary Rigor Clause. *Id.* at 535 n 5. We rejected the argument, explaining that the clause applied to "conditions of confinement" and "prison practices." *Id.* Similarly, in *State v. Moen*, 309 Or 45, 96, 786 P2d 111 (1990), the Supreme Court observed that Article I, section 13, "is not limited to beatings or other forms of physical brutality," and it also applies to "the conditions" of incarceration.

In *Schafer v. Maass*, 122 Or App 518, 858 P2d 474 (1993), in reversing the dismissal of a habeas corpus petition, we determined that the plaintiff had alleged facts sufficient to state a claim under Article I, section 13, because he alleged that he was being subjected to "ongoing and periodic assaults" by named employees of the defendant, which was conduct that would be recognized "'as an abuse to the extent that it cannot be justified by necessity.'" *Id.* at 522 (quoting *Sterling*, 290 Or at 620). The court also phrased the relevant constitutional right as the right "to be free from unnecessary physical abuse." *Id.* at 523.

In a case challenging administrative rules governing prison mail, we considered an argument that those rules violated Article I, section 13. *Smith v. Dept. of Corrections*, 219 Or App 192, 194, 182 P3d 250 (2008), *rev den*, 345 Or 690 (2009), *cert den*, 557 US 923 (2009). We rejected that argument:

> "[U]nlike assaults or overly intrusive bodily searches, the restrictions that petitioner challenges cannot be said on their face to subject inmates to unnecessary rigor. Several of the restrictions—such as those limiting sexually explicit materials, banning fantasy and role-playing games, and restricting inmate-to-inmate correspondence—have been routinely upheld as rationally related to legitimate penological goals."

*Id.* at 198.

More recently, we addressed the Unnecessary Rigor Clause in a habeas corpus proceeding in *Lawson v. Cain*, 323 Or App 730, 524 P3d 529, *rev den*, 371 Or 106 (2023). In that case, we affirmed the trial court's ruling that the failure "to provide adequate preventative and management measures in response to the COVID-19 virus in the prison

subjected plaintiff, who is medically vulnerable, to 'unnecessary rigor.'" *Id.* at 731. After describing *Sterling*'s analysis of Article I, section 13, we concluded that it applied to those confined in prison, and we rejected the defendant's argument that it required a showing that the defendant acted with a particular subjective intent. *Id.* at 737-38. Applying *Sterling*, we framed the test in terms of whether the practice "'constitutes a cognizable indignity and if so, whether it was justified by necessity.'" *Id.* at 736 (quoting *Sterling*, 290 Or at 622). However, we acknowledged that the reference to a "cognizable indignity" suggested a subjective component, and we emphasized that the relevant test was objective, *id.* at 738, and that courts should consider whether "'a particular prison or police practice would be recognized as an abuse to the extent that it cannot be justified by necessity,'" *id.* at 735 (quoting *Sterling*, 290 Or at 620).

That survey of the case law indicates that the Unnecessary Rigor Clause prohibits prison practices or treatment that are unnecessarily harsh, strict, or severe, including practices or treatment that are abusive, degrading, or inhumane (*Sterling*, *Schafer*). It also applies to a prison environment that unnecessarily exposes AICs to serious health hazards (*Bedell*, *Moen*, *Freudenthaler*, *Lawson*). However, it does not extend to restrictions on freedom that are an intrinsic part of prison life (*Smith*). As the court put it in *Sterling*, the constitutional provision is not so broad "as to disregard the numerous and pervasive conditions intrinsic to the life of prisoners to which persons who have not forfeited their liberty would not willingly submit." 290 Or at 620.

3. *Historical circumstances and cases from other jurisdictions*

Finally, we consider "the historical circumstances" that led to Oregon's adoption of the Unnecessary Rigor Clause. *Priest*, 314 Or at 416. Article I, section 13, was based on an identical provision of the 1851 Indiana Constitution. *See Priest*, 314 Or at 418 (discussing Article I, section 14); *see also* W. C. Palmer, *The Sources of the Oregon Constitution*, 5 Or L Rev 200, 200-01 (1926).

"[T]he evidence is circumstantial, but strong, that the members of the Committee on Bill of Rights drew heavily on the Bill of Rights of the Indiana Constitution of 1851 when drafting Oregon's Bill of Rights. [One delegate] Delazon Smith had spoken approvingly of the Indiana Constitution and its Bill of Rights when he argued in favor of including a bill of rights in Oregon's Constitution. The order of the sections in the Report of the Committee on Bill of Rights is remarkably similar to the order of the corresponding sections in the Indiana Bill of Rights. Finally, the text of the corresponding sections is frequently identical or greatly similar."

Claudia Burton and Andrew Grade, *A Legislative History of the Oregon Constitution of 1857 - Part I (Articles I & II)*, 37 Willamette L Rev 469, 483-84 (2001) (footnotes omitted). The delegates to the constitutional convention do not appear to have discussed the Unnecessary Rigor Clause. *See* David Schuman, *The Creation of the Oregon Constitution*, 74 Or L Rev 611, 625-28 (1995) (explaining that the debates about individual rights centered on religion and the powers of the jury but "[t]he delegates did not discuss other sections of the bill of rights in any recorded detail").

Four other states have unnecessary rigor provisions in their state constitutions: Tennessee, Indiana, Utah, and Wyoming. Tennessee was the first to include an unnecessary rigor provision, followed by Indiana, Oregon, and Wyoming:

"Tennessee's unnecessary rigor provision entered the state's constitution in the state constitutional convention of 1796. Indiana's prohibition against unnecessary rigor formed part of the constitution of 1816, the state's first constitution, and was maintained in the 1851 constitutional convention. Oregon's unnecessary rigor provision likewise appeared in the state's first constitution, the constitution of 1857, which appears to have been modeled on Indiana's. Wyoming's unnecessary rigor provision likewise appeared in the state's first constitution of 1889."

Caroline Davidson, *State Constitutions and the Humane Treatment of Arrestees and Pretrial Detainees*, 19 Berkeley J Crim L 1, 25-26 (2014) (footnotes omitted).

Courts in those states have tended to narrowly construe the meaning of unnecessary rigor. Tennessee has

focused on unnecessary use of force against AICs. *See, e.g.*, *Sanders v. State*, 216 Tenn 425, 431, 392 SW2d 916, 918-19 (1965); *see also* David L. Hudson Jr., *The Tennessee Constitution's "Unnecessary Rigor" Provision*, Tennessee Bar Journal, March 2015, at 12-13 (explaining that Tennessee courts view it as the state counterpart to the federal prohibition against excessive force). Indiana courts have focused on cases involving beatings or shootings of AICs. *See McQueen v. State*, 711 NE2d 503, 505 (Ind 1999) (the provision prohibits "extreme instances of mistreatment and abuse"); *Kokenes v. State*, 213 Ind 476, 490, 13 NE2d 524, 530 (1938) (beating of inmate); *Roberts v. State*, 159 Ind App 456, 458, 307 NE2d 501, 503 (1974) (shooting during a prison protest). And Utah's high court has pointed to Oregon's account of how the provision protects against "abuse" or "'needlessly harsh, degrading, or dehumanizing'" treatment of AICs. *Bott v. DeLand*, 922 P2d 732, 740 (Utah 1996), *abrogated by Spackman v. Board of Education*, 2000 UT 87, 16 P3d 533 (2000) (quoting *Sterling*, 290 Or at 622); *see also Dexter v. Bosko*, 2008 UT 29, ¶ 19, 184 P3d 592, 597 (2008) ("A prisoner suffers from unnecessary rigor when subject to unreasonably harsh, strict, or severe treatment. This may include being unnecessarily exposed to an increased risk of serious harm."). None of those courts have applied a "cognizable indignity" standard.

In *Sterling*, 290 Or at 618, our Supreme Court explained that Oregon's adoption of Article I, section 13, was part of a tradition of states adopting constitutional provisions that sought to make prison conditions less brutal and more humane. Thus, to the limited extent that the historical circumstances of the provision's enactment and cases from other jurisdictions shed light on its meaning, they also point toward a focus on prohibiting abusive, degrading, or inhumane treatment of AICs.

   4.   *Applying the constitutional prohibition against unnecessary rigor*

Considering the text, the case law, and the historical context, we draw the following conclusions. When considering claims of unnecessary rigor, courts *may* consider whether a practice subjects AICs to a "cognizable indignity,"

especially when secondary sources relating to the prac-
tice—like the federal and international standards for prison
searches cited in *Sterling*, 290 Or at 620-22—emphasize
the importance of conducting the practice in a manner that
shows respect for a person's dignity. Nevertheless, when
assessing claims of unnecessary rigor more generally, the
primary consideration should be whether the prison condi-
tions and treatment are more strict, severe, or harsh than
the circumstances require—a determination that requires
consideration of whether the conditions and treatment are
abusive, degrading, or inhumane.

When applied to medical treatment, providing no
medical care at all for a serious medical condition requiring
treatment would certainly be abusive, degrading, or inhu-
mane. But when defendant is providing medical treatment,
merely because there are alternative forms of medical treat-
ment that may be available to persons who are not incarcer-
ated, it does not follow that the failure to provide that specific
treatment to AICs is unnecessarily abusive, degrading, or
inhumane. Rather, to prove that medical treatment amounts
to unnecessary rigor, AICs must show some serious harm or
injury, or exposure to an unnecessary risk of serious injury,
or that the failure to provide the treatment is contrary to
the consensus of medical professionals for treatment of the
condition. *See Bedell*, 307 Or at 570, 570 n 7 (AICs "entitled
to an environment that does not unnecessarily subject them
to serious health hazards"); *see also Lawson*, 323 Or App at
733-34 (failure to take steps to reduce unnecessary risks of
exposing medically vulnerable AICs to COVID-19 amounted
to unnecessary rigor).

Applying that standard here, we conclude that the
trial court did not err in its determination that plaintiff
was subjected to unnecessary rigor under Claim 2 (cervical
radiculopathy), but it did err under Claim 6 (chronic pain)
and Claim 7 (PTSD).

With respect to the treatment of plaintiff's cervical
radiculopathy, the trial court explained that one of defen-
dant's own experts "acknowledged at trial that an MRI would
be reasonable, given [p]laintiff's worsening symptoms and
the degenerative disease observed in the January 2021 X-ray

images." The record indicates that plaintiff's condition might have been getting worse, and defendant did not put forth any evidence that an MRI for plaintiff was not medically necessary. Indeed, medical experts testifying on behalf of both plaintiff and defendant agreed on the need for an MRI. We conclude that the failure to provide an MRI was more strict, severe, or harsh than the circumstances required, and it was reasonable for the trial court to view that failure as abusive, degrading, or inhumane. The trial court did not err in concluding, under Claim 2, that defendant's treatment of plaintiff's cervical radiculopathy violated the constitutional prohibition against unnecessary rigor.

We reach a different conclusion with respect to Claim 6. In determining that defendant's treatment of plaintiff's chronic pain subjected him to unnecessary rigor, the trial court stated:

> "Pain at the volume and duration consistently described by [p]laintiff over nearly a decade, from his medical screening at the Department of Corrections in May 2014, to the present, is a cognizable indignity. While back pain is notoriously difficult to treat and even if [p]laintiff had received appropriate treatment he might still be experiencing significant pain, because [d]efendant has not taken the appropriate steps to diagnose and treat that pain, there is ample reason to believe by a preponderance of the evidence that at least the magnitude of [p]laintiff's chronic pain has been unnecessary."

We disagree with that analysis. In our view, whether there was a "cognizable indignity" is too malleable a concept to assess medical treatment of chronic pain. Unlike in *Sterling*, 290 Or at 620-22, the trial court's use of the concept was not grounded in secondary sources setting standards for a treatment or practice related to human dignity. As the trial court acknowledged in this case, "back pain is notoriously difficult to treat," and if an AIC's complaints about prison medical care amount to no more than the kinds of problems that a person is likely to experience attempting to obtain adequate medical care outside of incarceration, then the treatment is not likely to rise to the level of a constitutional violation. Here, the record shows that, at the time of trial, defendant was—and had been—attempting to treat

plaintiff's chronic pain, just not in the manner plaintiff sought. Plaintiff did not establish that defendant's efforts to help alleviate his chronic pain were contrary to medical consensus or were exposing him to unnecessary risks. Because plaintiff failed to show that defendant's treatment of his chronic pain was more strict, severe, or harsh than necessary, or that it was abusive, degrading, or inhumane, the trial court erred in determining that defendant violated the constitutional prohibition against unnecessary rigor.[3]

Turning to Claim 7, the trial court stated:

"[G]iven the severity of [p]laintiff's PTSD symptoms * * * and of [p]laintiff's PTSD-related physical self-harm * * *, [p]laintiff's inadequately treated PTSD constitutes a cognizable indignity in an unnecessary rigor analysis. Dr. Wynn commented in his June 26, 2023, report, 'This is a very difficult management problem because his PTSD and anxiety underlie his headaches and exacerbate the pain. The pain probably worsens his anxiety.' This court has already found unnecessary rigor as to [p]laintiff's related headache and chronic pain claims, and because [p]laintiff is willing to engage in additional counseling and appropriate DBT and combat veteran support groups (from which he previously benefitted), it is apparent that [d]efendant has these remedies at its disposal but is not making them available. This failure to provide psychological—as opposed to psychiatric—support therefore lacks necessity, and amounts to unnecessary rigor."

Once again, we are not persuaded by the trial court's reliance on the concept of a "cognizable indignity" in this context, which was not grounded in secondary sources or a medical consensus setting standards for the treatment of PTSD. Indeed, the trial court expressly ordered defendant to confer with experts at the VA about best practices for treating PTSD. The trial court acknowledged a medical expert's testimony that PTSD presents "'a very difficult management problem.'" Here, plaintiff had been receiving mental health services for PTSD since entering custody, including individual counseling, and he had been prescribed at least six medications to help alleviate the condition. There is no indication

---

[3] Defendant does not challenge the trial court's determination, under the first count of Claim 6, that defendant's treatment of plaintiff's chronic pain constituted cruel and unusual punishment.

that defendant's treatment of, or failure to treat, plaintiff's PTSD was contrary to medical consensus, especially given the recommendation to consult with the VA to determine what those best practices might be. As a result, we are not persuaded that defendant's treatment of plaintiff's PTSD was unnecessarily strict, severe, or harsh, or that it was abusive, degrading, or inhumane. The trial court erred in ruling that defendant's treatment of plaintiff's PTSD violated the constitutional prohibition against unnecessary rigor.

We also address defendant's argument that the trial court improperly relied on plaintiff's status as a military veteran. That argument has merit. When discussing the prohibition against unnecessary rigor, the trial court made the following observations:

> "[T]the determination of what constitutes a cognizable indignity depends on social and individual psychology and the perception of the general public, [and it] has informed the court's unnecessary rigor analysis in this case. It is noteworthy that our society claims to value highly the lives and welfare of our nation's military veterans, dedicating two federal holidays and countless public tributes to them every year. It follows, then, that the suffering in prison of a 90% combat-disabled American military veteran, from injuries incurred in the course of his service, and but for the consequences of which he might never have been incarcerated after his service, must be particularly offensive to the general public. It is in this context of heightened sensitivity that the court has made these findings."

But when determining whether an AIC has been subjected to unnecessary rigor, courts should evaluate the propriety of a defendant's practice or treatment, not the plaintiff's characteristics. When considering whether a practice or treatment is more strict, severe, or harsh than the circumstances require, we are not aware of any authority for "heightened sensitivity" to claims filed by military veterans.

The trial court explained that its unnecessary rigor analysis was informed by social and individual psychology as well as by its understanding of public perceptions of veterans. However, as we explained in *Lawson*, 323 Or App at 737-38, the constitutional test is an objective one. Courts properly apply that constitutional provision by addressing,

at least in the first instance, whether the conditions and treatment are more strict, severe, or harsh than the circumstances require, which can include a consideration of whether they are abusive, degrading, or inhumane.

### C.  *Order to Provide Specific Dosage of Medication*

In his fifth and final assignment of error, defendant argues that the trial court's order to provide a specific dosage of the medication gabapentin exceeded the scope of permissible relief in a habeas corpus proceeding. Although we have concluded that the trial court erred, under the second count of Claim 6, in determining that defendant's treatment of plaintiff chronic pain violated the constitutional prohibition against unnecessary rigor, defendant does not challenge on appeal the court's determination that the treatment also constituted cruel and unusual punishment. Because the trial court's ruling on that count stands, we address defendant's argument that the court was not authorized to order relief in the form of a specific dosage of gabapentin under the first count of Claim 6.

Based on the general judgment, defendant began providing plaintiff gabapentin at a dosage of 300 milligrams per day, but plaintiff's expert, Dr. Baskerville (who was not treating plaintiff), recommended increasing the dosage to 300 milligrams three times per day and further increasing the dosage as necessary to alleviate plaintiff's pain up to a maximum of 900 milligrams three times per day, nine times more than defendant's medical staff prescribed. Defendant's medical experts balked at that recommendation due to concerns about gabapentin's interaction with plaintiff's other medications, including valium. According to the chief medical officer of ODOC, "even the relatively low dosage of 300 [milligrams] prescribed by the trial court is not medically indicated in plaintiff's case, so much so that I believe that it is possibly negligent to prescribe it." Similarly, a nurse practitioner at SRCI opined that "it would be malpractice and medically unnecessary to continue increasing [p]laintiff's dosage of gabapentin," particularly considering recent incidents where plaintiff had experienced disorientation and fainting that could have been related to the combination of sedative drugs plaintiff had been prescribed.

Defendant subsequently reduced plaintiff's dosage of valium. On March 1, 2024, the trial court indicated that defendant's "concerns about a gabapentin trial should be largely alleviated," and the court expected "the gabapentin trial will have occurred as recommended by Dr. Baskerville by the time of the [next] compliance hearing, if the nerve block and ablation has not by then substantially alleviated [p]laintiff's pain."

On appeal, defendant argues that "the court exceeded the scope of its authority in ordering defendant to provide gabapentin as Dr. Baskerville suggested and in ordering specific alterations to the medications ODOC provided." We agree with defendant.[4]

We recognize that ORS 34.670 instructs a habeas court "to dispose of the party as the law and justice of the case may require," and that statute is "interpreted broadly" to achieve its "remedial purpose." *Shipman v. Gladden*, 253 Or 192, 204, 453 P2d 921 (1969). Nevertheless, here, the remedy does not fit because the only remaining basis for the relief ordered under Claim 6 was the court's determination that defendant subjected plaintiff to cruel and unusual punishment in violation of Article I, section 16.

Under the circumstances of this case, we conclude that the trial court could not order specific amounts of gabapentin under Claim 6. Accepting that defendant was deliberately indifferent to plaintiff's chronic pain when the Therapeutic Level of Care (TLC) team at SRCI initially denied plaintiff's requests for gabapentin, which defendant does not challenge on appeal, we focus on the relief ordered by the court. Defendant began providing gabapentin as ordered. The fifth assignment of error concerns the trial court's subsequent order to increase the dosage of gabapentin.

We conclude that that order exceeded the court's authority to remedy the constitutional violation. In *Billings*, the Supreme Court explained that an AIC cannot show deliberate indifference to serious medical needs—as required

---

[4] While the appeal was pending, the Appellate Commissioner granted defendant a limited stay pending completion of the appeal of the trial court's orders requiring medical providers to increase plaintiff's prescription for gabapentin beyond 300 milligrams per day.

to demonstrate the infliction of cruel and unusual punishment—when the AIC "establishes nothing more than an honest difference of medical opinion about correct diagnosis and necessary treatment." 323 Or at 181. We see no reason why the same rationale does not apply when ordering relief in a habeas corpus case for a violation of the constitutional prohibition against the infliction of cruel and unusual punishment.

The court's authority extends to remedying a constitutional violation. *See* ORS 34.362(2) (stating that in habeas corpus challenges to the conditions of confinement, plaintiffs must establish a deprivation "of a constitutional right that requires immediate judicial scrutiny and for which no other timely remedy is practicably available to the plaintiff"). Here, the trial court remedied the constitutional violation when it ordered defendant to begin a gabapentin trial. As to dramatically increasing that dosage, there was a difference of medical opinion about whether plaintiff's dosage of gabapentin should be increased. When a plaintiff establishes deliberate indifference to a serious medical need and the court orders a specific medication as a remedy, we are not persuaded that the trial court has statutory authority to subsequently require an increase in the dosage of the medication. *See Billings*, 323 Or at 180-81 (explaining that an AIC cannot show deliberate indifference when there is "an honest difference of medical opinion about *** necessary treatment"). We therefore conclude that the habeas court had no authority to order increases in the dosage of gabapentin under the first count of Claim 6.

We turn to our disposition. We reverse the trial court's orders on Claims 1, 3, 5, and 7 and remand for entry of an amended judgment denying those claims. On Claim 6, we reverse the court's determination that defendant's treatment of plaintiff's chronic pain subjected him to unnecessary rigor. We therefore remand for entry of an amended judgment denying the second count of Claim 6, and we also reverse the relief ordered under the first count of Claim 6 in the order dated March 1, 2024. We otherwise affirm.

Judgment on Claims 1, 3, 5, and 7 reversed and remanded; judgment on Claim 6 reversed in part and remanded; order dated March 1, 2024, reversed in part; otherwise affirmed.